Slip Op. 17-05

UNITED STATES COURT OF INTERNATIONAL TRADE

MID CONTINENT STEEL & WIRE, INC.,

Plaintiff,

v.

UNITED STATES,

Defendant,

v.

OMAN FASTENERS, LLC

Defendant-Intervenor.

Before: Richard W. Goldberg, Senior Judge
Consolidated Court No. 15-00214

**PUBLIC VERSION**

### OPINION AND ORDER

[The court remands for Commerce to either change its selection of profit data or provide a more thorough explanation of its reliance on third-country profit data.  Unless the issue is rendered moot on remand, the court orders Commerce to provide a more thorough explanation for any determinations concerning the calculation of a profit cap.  The court sustains the remainder of the contested determinations of Commerce.]

Dated:  January 26, 2017

*Adam Henry Gordon* and *Ping Gong*, The Bristol Group PLLC, of Washington, DC, argued for plaintiff.

*Mikki Cottet*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant.  With her on the brief were *Benjamin C. Mizer*, Principle Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director.  Of Counsel on the brief was *Lydia C. Pardini*, Office of Chief Counselor for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington D.C.

*Michael P. House* and *David J. Townsend*, Perkins Coie LLP, of Washington, D.C., argued for defendant-intervenor.  With them on the brief was *David S. Christy, Jr.*

Goldberg, Senior Judge:  Plaintiff, Mid Continent Steel & Wire, Inc. ("Mid Continent"), and Defendant-Intervenor, Oman Fasteners, LLC ("Oman Fasteners"), separately moved for judgment on the agency record under USCIT Rule 56.2.  The court remands for the Department of Commerce ("Commerce") to either change its selection of profit data or provide a more thorough explanation of its reliance on third-country profit data.  Unless the issue is rendered moot on remand, the court orders Commerce to provide a more thorough explanation for any determinations concerning the calculation of a profit cap.  The court sustains the remainder of the contested determinations of Commerce.

## BACKGROUND

In June of 2014, Commerce initiated an antidumping duty investigation on steel nails from the Sultanate of Oman ("Oman").  *Certain Steel Nails From India, the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, the Republic of Turkey, and the Socialist Republic of Vietnam*, 79 Fed. Reg. 36,019 (Dep't Commerce June 25, 2014) (initiation).  Commerce selected Oman Fasteners as the mandatory respondent.  Antidumping Duty Investigation of Certain Nails from the Sultanate of Oman Resp't Selection, P.R. 51 (July 29, 2014).

Under 19 U.S.C. § 1673, antidumping duties are "equal to the amount by which the normal value exceeds the export price (or the constructed export price) for the [subject] merchandise."  Section 1677a defines "export price" and "constructed export price."  The "export price" is the price the producer or exporter charges to an "unaffiliated purchaser" either within or for exportation to the United States.  Sometimes, however, the producer sells subject merchandise to an affiliated purchaser in the United States.  The "constructed export price" is the

price that the affiliated purchaser charges within the United States "to a purchaser not affiliated

with the producer or exporter."

On December 29, 2014, Commerce issued its preliminary determination of sales at less

than fair value. *Certain Steel Nails from the Sultanate of Oman*, 79 Fed. Reg. 78,034 (Dep't

Commerce Dec. 29, 2014) (prelim. determ.) ("*Preliminary Determination*") and accompanying

memorandum ("Prelim. Mem."), P.R. 150 (Dec. 19, 2014).  Mid Continent had urged Commerce

to find that Oman Fasteners and its primary U.S. customer are affiliated.  However, Commerce's

Preliminary Determination included a finding that there was no such affiliation.  Prelim. Mem.

8–9.

When calculating normal value, Commerce generally equates the home-market price of

subject merchandise with the normal value of subject merchandise.  19 U.S.C. § 1677b(a)(1).

But there are exceptions to this norm.  Commerce uses a third-country price as the normal value

if the aggregate quantity of home-market sales of subject merchandise is less than five percent of

U.S. sales of subject merchandise.  *Id.* § 1677b(a)(1)(C)(ii).  However, Commerce cannot use

this third-country price if aggregate sales in the third-country amount to less than five percent of

aggregate sales to the U.S.  *Id.* § 1677b(a)(1)(B)(ii)(II).  If Commerce cannot use a third-country

price, Commerce then resorts to calculating the constructed value ("CV") of subject

merchandise.  Section 1677b(e) guides Commerce's calculation of CV.  *Id.* § 1677b(a)(4).

In the course of the investigation, Commerce concluded that Oman Fasteners had an

insufficient volume of both home-market and third-country market sales.  Commerce Request for

CV Profit Comments and Information, P.R. 93 (Oct. 17, 2014).  As a result, Commerce asked

any interested parties to submit information for use in calculating a constructed value selling

expenses and profit ratio under § 1677b(e).  *Id.*  Oman Fastener's submitted information

concerning various third parties, reflecting what Oman Fasteners believed to be an appropriate

CV profit rate.

On May 20, 2015 Commerce issued its final determination. *Certain Steel Nails from the*

*Sultanate of Oman*, 80 Fed. Reg. 28,972 (Dep't Commerce May 20, 2015) (final determ.) ("*Final*

*Determination*") and accompanying memorandum ("I&D Mem."). In its *Final Determination*,

Commerce declined to use Oman Fastener's preferred CV profit rate data, opting instead to use

the financial statements of a Thai company, Hitech. I&D Mem. 12. Commerce also affirmed its

earlier finding that no affiliation exists between Oman Fasteners and its U.S. purchaser. *Id.* at

20.[1]

Both Mid Continent and Oman Fasteners challenge the *Final Determination*. Mid

Continent argues, as it did at the administrative level, that Commerce erred when it found no

affiliation and, thus, declined to calculate a constructed export price for the steel nails. For

reasons discussed below, the court disagrees and sustains Commerce's finding of no affiliation.

Oman Fasteners argues, as it did at the administrative level, that Commerce erred in

relying on data from Hitech when determining the CV profit rate. Specifically, Oman Fasteners

insists that Commerce erred when it (i) refused to use Oman Fastener's own home-market sales

of steel nails to calculate the CV profit of the steel nails, (ii) relied on third-country profit data of

comparable products instead of home-market profit data to calculate CV profit, (iii) rejected the

partially translated financial statement of L.S. Industry Co Ltd. ("LSI"), a Thai producer of steel

nails, and refused to allow Oman Fasteners to supplement the record with the fully translated LSI

statement, and (iv) refused to calculate a profit cap on the CV profit rate. For reasons discussed

---

[1]     Commerce issued separately a memorandum specifically addressing the affiliation issue
at greater length. *Certain Steel Nails from the Sultanate of Oman: Affiliation Status of Oman
Fasteners, LLC and its U.S. Customer*, P.R. 225 ("Affiliation Mem.") (May 14, 2014).

below, the court sustains Commerce's decisions with the exception of its reliance on third-

country profit data of comparable products instead of home-market profit data (point ii), which

the court remands for either further explanation or reconsideration.  The court also orders

Commerce to more fully explain any profit cap determinations, unless that issue is rendered

moot on remand.


## DISCUSSION

I.     **The Court Sustains Commerce's Finding of No Affiliation Between Oman Fasteners and its Largest U.S. Customer.**

To support its determination that Oman Fasteners was not affiliated with its largest U.S.

customer,[2] Commerce explained that the customer did not control Oman Fasteners.  Affiliation

Mem. 4–6.  Mid Continent contests this finding on two grounds.  First, Mid Continent claims

that Commerce applied the wrong legal standard for affiliation through control.  Rule 56.2 Mot.

for J. Upon the Agency R. of Pl. Mid Continent Steel & Wire, Inc. 19–20, ECF No. 26 ("Mid

Cont. Br.").  According to Mid Continent, the law requires only an "ability to control" and

Commerce incorrectly required that the customer assert actual control over Oman Fasteners.  *Id.*

Second, Mid Continent contends that Commerce's finding of no affiliation lacked the support of

substantial evidence.  *Id*. at 14.  For the reasons set forth below, Mid Continent's claims are

without merit.

### A.  Background

In an antidumping investigation, Commerce must determine either an export price or a

constructed export price for the subject merchandise.  *See* 19 U.S.C. § 1677(35).  Generally, the

---

[2]      The court will refer to Oman Fasteners' largest U.S. customer, [[         ]], as "the customer" to preserve confidentiality.

export price is the price of the subject merchandise when sold to an "unaffiliated purchaser in the United States." *Id.* § 1677a(a).  When an exporter sells the merchandise to a U.S. purchaser with which it is affiliated, Commerce typically determines a constructed export price for the merchandise.  *Id.* § 1677a(a), (b).  Mid Continent argues that Oman Fasteners and the customer are affiliated, making it necessary to construct an export price.

Section 1677(33) defines "affiliated persons" as, in relevant part, "[a]ny person who controls any other person and such other person."  § 1677(33)(G).  Section 1677(33) explains that "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person."  The Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA") provides that "[a] company may be in a position to exercise restraint or direction . . . through corporate or family groupings, franchises or joint venture agreements, debt financing, or close supplier relationships in which the supplier or buyer becomes reliant upon the other."  SAA, H.R. Doc. No. 103–316, vol. 1, at 838 (1994).  Commerce incorporated this guidance from the SAA in its regulations, which direct the agency to consider "[c]orporate or family groupings; franchise or joint venture agreements; debt financing; and close supplier relationships" when assessing control.  19 C.F.R. 351.102(b)(3).  The regulation stipulates that the agency cannot "find that control exists on the basis of these factors unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product."  *Id.*  In addition, Commerce "will consider the temporal aspect of a relationship in determining whether control exists; normally, temporary circumstances will not suffice as evidence of control."  *Id.*

On October 28, 2014, Mid Continent made a submission to Commerce arguing that

Oman Fasteners was affiliated with its largest U.S. customer.  *See* Affiliation Analysis, P.R. 116

(Nov. 7, 2014).  Commerce "examined all claims submitted by [Mid Continent] related to 1) the

[[                                                      ]] by Oman Fasteners to [the customer]; 2) [[

                                                ]]; 3) Oman Fasteners['] [[

           ]] in the financial statements; and 4) Oman Fasteners' president's [[

                        ]]."  Affiliation Mem. 4–5.  Specifically, Oman Fasteners' sales of

subject merchandise to the customer constituted nearly [[              ]] of total U.S. sales of

subject.  *Id.* at 5.  And the supply agreement includes a [[              ]] provision under which,

according to Oman Fasteners, "[s]ales orders from [[



                        ]]."  Oman Fasteners' Resp. to Suppl. Section A&C

Questionnaire 7 ("Oman Fast. Resp."), P.R. 129 (Nov. 21, 2014).  Also, in its 2013 financial

statement, Oman Fasteners recognized the [[                                            ]] the

customer as a [[              ]].  Affiliation Mem. 6.  Finally, Oman Fasteners' [[

                        ]].  Affiliation Analysis 11.

Commerce rejected Mid Continent's argument in both the preliminary and the final

determinations.  In its *Preliminary Determination*, Commerce explained that

> [a]fter careful examination of the record evidence, we have determined that Oman
> Fasteners is not affiliated with [the customer]. First, neither company shares
> common ownership, employees, [or] board members. Second, the fact that [[
>                                                             ]], does not provide [the
> customer] control over Oman Fasteners.  Nothing on the record indicates that that
> the relationship between these two companies is not market driven or the sales are
> not at arm's length.  Third, [the customer] is not Oman Fasteners' [[    ]] customer:
> Oman Fasteners sold to [an] additional [[                        ]] during the POI.

Fourth, [[          ]] between the two companies, does not substantiate finding affiliation between the two companies.  Finally, the president of Oman Fasteners [[                                    ]].  Therefore, for all reason listed above, we preliminarily do not find that Oman Fasteners is affiliated with [the customer].

Prelim. Mem. 2–3.  Commerce restated this reasoning in the Affiliation Memorandum and included additional reasons for its rejection of Mid Continent's arguments:

> As we stated in the preliminary determination, we do not find that [[                                    ]] warrants finding affiliation.  Consistent with [Commerce's] past decisions, we find that the proportion of sales to one customer does not constitute enough information to determine a close supplier relationship. For example in *OCTG from Taiwan and TIJID*, [we] did not find a "buyer and seller" affiliated even when "the proportion {of sales transactions} was 100 percent."  [Commerce] thoroughly verified the affiliation issue and found no evidence of control by [the customer].  [Mid Continent] also claims that the prices charged to [[               ]].  [Commerce] has not found that Oman Fasteners [[
>
>                                                                              ]]. Additionally, based on record evidence, we find that prices are based on sales negotiations and are arm's length transactions.  For example, the record indicates [[                                                                    ]]. Additionally, record evidence indicates that Oman Fasteners [[
>
>                                    ]].
> Second, notwithstanding Mid Continent's argument regarding the [[             ]], we disagree that Oman Fasteners [[                                    ]]. During our verification of Oman Fasteners, we did not find evidence that Oman Fasteners [[             ]].  Oman Fasteners ordinarily receives [[                    ]] and, thus, there is no need to place [[                                    ]].  Additionally, during verification we saw that Oman Fasteners has [[        ]] customers and observed [[                    ]].  Further, as Oman Fasteners noted [[
>
>                                    ]]. [[
>
>                    ]].  In that proceeding, the Department found no affiliation between [[                    ]].
> Third, [Mid Continent] claims that Oman Fasteners recognizes that [[                                    ]].  Oman Fasteners' audited financial statements describe [[                    ]].  We do not find this recognition as an additional factor toward a

finding of affiliation because typically [[                                    ]].
In fact, we find that Oman Fasteners' listing [[
                    ]], underscores that the relationship between these companies is
market-driven. Finally, record evidence indicates that Oman Fasteners is
[[            ]] its customer base, which [[
                    ]].  Based on the above record evidence, we continue to find that
Oman Fasteners and [its customer] are not affiliated.

Affiliation Mem. 5–7.

## B. Discussion

The court begins with Mid Continent's assertion that Commerce incorrectly required

evidence of "actual control" even though "the law" requires only the "ability to control."  Mid

Cont. Br. 19.  Mid Continent highlights Commerce's finding that there is no "evidence that

Oman Fasteners [[                                    ]]."  *Id*. (citing Affiliation Mem. 6).

According to Mid Continent, such an empirical observation is irrelevant because, "as th[is] court

has recognized, control will be found where one party has the ability to control another, without

requiring such control to have actually been exercised."  *Id*.[3]

But Commerce correctly applied the legal standard governing affiliation by control.  Mid

Continent focuses upon Commerce's statement about the [[

---

[3]      In raising its legal challenge, Mid Continent also cites 19 C.F.R. § 351.102(b)(3) for the
proposition that "[t]he regulation merely requires 'the <u>potential</u> to impact decisions concerning
the production, pricing, or cost of the subject merchandise or foreign like product." Mid Cont.
Br. 19. Although Mid Continent correctly states the regulation's text, that portion of the
regulation does not govern the determination at issue in this case.  The regulation provides that
Commerce "will not find that control exists [based on certain factors, including a close supplier
relationship] unless the relationship has the potential to impact decisions concerning the
production, pricing, or cost of the subject merchandise or foreign like product."  19 C.F.R. §
351.102(b)(3).  The court must uphold Commerce's reasonable interpretations of its regulations,
and Commerce reasonably reads this portion of the regulation to delineate not when control
exists, but rather when it will not exist.  As such, the language cited by Mid Continent has no
bearing here, where Commerce first determined that the customer did not control Oman
Fasteners after considering the factors listed in § 351.102(b)(3).

]], to the exclusion of Commerce's more fulsome analysis.  Moreover, while Commerce's statement appears consistent with an actual-control standard, it is also consistent with an ability-to-control standard.  The fact that Oman Fasteners had never faced a production crunch necessitating the [[                                        ]] under the supply agreement is probative of whether Oman Fasteners might face such a crunch in the future.  If there was little likelihood that the [[            ]] provision would trigger, then Commerce could reasonably conclude that the provision did not in fact grant the customer the ability to control Oman Fasteners.  Thus, the court finds that Commerce correctly applied the ability-to-control standard, and not an actual-control standard.[4]

Accordingly, the question now before the court is whether Commerce erred in concluding that the customer lacked control over Oman Fasteners in light of the statutory standard in 19 U.S.C. § 1677(33)(G) and the regulatory factors in 19 C.F.R. § 351.102(b)(3).

Mid Continent contends that the record, taken as a whole, mandates a finding of affiliation, and points to a number of pieces of record evidence that support this view.  First, Mid Continent invokes the sheer percentage of Oman Fastener's U.S. sales that went to this particular customer, measured both by volume and value.  Mid Cont. Br. 14.  Mid Continent also highlights that Oman Fasteners was a [[                        ]] in 2012, which had no nail-production capability [[                            ]] and which enjoyed its relationship with the customer at least in part because [[                                    ]].  *Id.* at 15.  Second, Mid Continent notes that Oman Fasteners recognized in its own financial statements that the firm's reliance on the customer was [[      ]].  *Id.* at 18, 20.  Third, Mid Continent

---

[4]     The court does not address whether, if the provision ever did trigger, the customer's contractual right to have [[                    ]] amounts to the ability to control Oman Fasteners.

mentions that Oman Fasteners' [[                                                      ]]. *Id.*

at 18.  Fourth, Mid Continent stresses that the supply agreement spans a [[         ]] term and

has been in place since Oman Fasteners' [[              ]]. *Id.* at 18–19.  And fifth, Mid Continent

points to the provision of the supply agreement between Oman Fasteners and its customer that

grants [[


                                                                      ]]. *Id.* at 19–20.

      The court finds that Commerce properly weighed the entire record, including those

aspects highlighted by Mid Continent, when considering whether Oman Fasteners and its

customer were affiliated.  The court also finds that substantial evidence supports Commerce's

finding of no affiliation.  Addressing the percentage of U.S. sales between Oman Fasteners and

the customer, Commerce stated that "the proportion of sales to one customer does not constitute

enough information to determine a close supplier relationship."  Affiliation Mem. 5.  To support

this proposition, Commerce cited previous investigations in which the agency deemed a buyer

and seller unaffiliated even though the seller sold 100 percent of its subject merchandise to the

buyer.  *Id.* (citing *TIJID, Inc. v. United States*, 29 CIT 307, 366 F. Supp. 2d 1286 (2005) and

*Certain Oil Country Tubular Products from Taiwan*, 79 Fed. Reg. 41,979 (Dep't Commerce July

18, 2014) (final determ.)).[5]

---

[5]      Mid Continent argues that *TIJID* is distinguishable.  Mid Cont. Br. 17–18.  According to
Mid Continent, in *TIJID* the court upheld Commerce's finding of no affiliation despite the buyer
purchasing 100 percent of the seller's subject merchandise because the record contained "no
other evidence of affiliation."  Mid Cont. Br. 17 (citing *TIJID*, 29 CIT at 322, 366 F. Supp. 2d at
1299).  Mid Continent points out that the record here does contain other evidence that could
support a finding of affiliation.  *Id*.  Even so, Commerce properly considered this additional
evidence and nevertheless reached the supportable determination that Oman Fasteners was
unaffiliated with the customer.

Commerce also determined that Oman Fasteners negotiated with the customer at arm's

length, and cited as evidence negotiations over price between Oman Fasteners and the customer

that, on at least one occasion, [[

                ]].  *Id.* at 6.  Indeed, Commerce noted that Oman Fasteners' prices to the customer

for a particular product [[                                    ]] other customers for the particular product.

*Id.*  This corroborates the conclusion that the relationship was market-driven, with the customer

lacking the ability to control Oman Fasteners.  With regard to the reference to a [[          ]]

in Oman Fasteners' financial statements, Commerce reasoned that this "underscores that the

relationship between these companies is market-driven" because "typically [[

                ]]."  *Id.*  Finally, as discussed above, Commerce determined that because the

[[            ]] provision would not likely trigger, the provision did not in fact grant the

customer the ability to control Oman Fasteners.  *Id.* [6]

        In sum, Commerce marshalled substantial evidence and a reasoned explanation for its

determination that the customer did not control Oman Fasteners under the statutory standard of §

1677(33)(G), and the regulatory factors of § 351.102(b)(3).  Although the evidence that Mid

---

[6]        Mid Continent argues that Commerce undermined this conclusion when it stated that,
because Oman Fasteners "ordinarily receives [[                                    ]] .
. . there is no need "to place [[                                    ]]."
Mid Cont. Br. 22.  According to Mid Continent, "[t]his reasoning is flawed" because, if Oman
Fasteners "ordinarily" receives [[                        ]] that means sometimes the
company does not.  *Id.*  In those instances, Mid Continent contends that Oman Fasteners would
be forced to [[                        ]] and would therefore be controlled by the
customer.  *Id.*  However, the court finds Commerce's reasoning to be sound and Mid Continent's
arguments to be too speculative.  The fact that Oman Fasteners might on occasion receive an
[[                        ]] does not necessarily obligate Oman
Fasteners to [[                ]].  The supply agreement mandates [[          ]]
only when necessary to [[                    ]].  Oman Fast. Resp.
7.  Just because [[                    ]]does not mean this provision would
trigger.  And in fact, Commerce found at verification that Oman Fasteners had never had cause
to [[                ]].  Affiliation Mem. 6.

Continent emphasizes could cut the other way, Commerce's citations to arm's length

negotiations and regular pricing, among other facts, are sufficient to support its determination as

reasonable.  The court will not usurp Commerce's authority by reweighing the evidentiary

record.

II.    **The Court Sustains Commerce's Decision to Reject Oman Fasteners' Home Market Profit Data, but the Court Remands for Either Further Explanation or Reconsideration of the Selection of Financial Statements.**

Oman Fasteners challenges the way that Commerce calculated constructed value ("CV").

Oman Fasteners first argues that Commerce erred in failing to use Oman Fasteners' own home

market sales to calculate the CV profit rate.  Second, Oman Fasteners argues that, even if

Commerce properly chose to use financial statements from other companies to ascertain the CV

profit rate, Commerce chose the wrong financial statements.  Third, Oman Fasteners argues that

Commerce erred in failing to put a ceiling, or "profit cap," on the CV profit rate.

### A.  Background

Under 19 U.S.C. § 1677b(a)(1), the normal value of subject merchandise is generally the

home-market price of the merchandise.  However, if the aggregate quantity of home-market sales

of the subject merchandise is less than five percent of U.S. sales of the subject merchandise,

Commerce uses a third-country price as the normal value.  *Id.* § 1677b(a)(1)(B)(ii).  This third-

country price is also subject to the five-percent threshold, and if that threshold is not met, then

Commerce resorts to CV.  *Id.* § 1677b(a)(4).

19 U.S.C. § 1677b(e) provides that the CV of merchandise is equal to the sum of (1) "the

cost of materials and fabrication or other processing of any kind employed in producing

merchandise," (2) "the actual amounts incurred and realized by the specific . . . producer being

examined . . . for selling, general, and administrative expenses [("SG&A")], and for profits, in

connection with the production and sale of a foreign like product, in the ordinary course of trade,

for consumption in the foreign country," and (3) "the cost of all containers and coverings of

whatever nature, and all other [incidental packaging] expenses."  However, if "actual data" on

the second component of CV—the specific producer's SG&A and profit—are "not available,"

then the statute permits Commerce to use any one of three alternative data sources listed under

(2)(B):

> (i) the actual amounts incurred and realized by the specific . . . producer . . . for selling, general, and administrative expenses, and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,

> (ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

> (iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise.

The SAA explains that the statute "does not establish a hierarchy or preference among these

alternative methods."  SAA 840.  The SAA further provides that "no one approach is appropriate

for use in all cases," and that "the selection of an alternative will be made on a case-by-case

basis, and will depend, to an extent, on available data."  *Id.*

Commerce concluded that it could not determine a normal value for the subject

merchandise because Oman Fasteners "did not have a viable home or third-country market

during the POI."  I&D Mem. 12–13.  Instead, Commerce calculated the CV of the merchandise.

Commerce explained that the lack of a viable home or third-country market precluded the agency

from calculating CV profit "using the preferred method under [19 US.C. § 1677b(e)(2)(A)], *i.e.*, based on the respondent's own home market or third country sales made in the ordinary course of trade."[7]  *Id.* at 13.  Specifically, Commerce found that "because Oman Fasteners did not have a viable home or third-country market, its volume of home market sales during the POI is too insignificant to reflect a meaningful home market profit rate."  *Id.*

Turning to the alternative profit sources listed in 19 U.S.C. § 1677b(e)(2)(B), Commerce again cited Oman Fasteners' lack of home-market sales as the reason it could not use the first alternative, Oman Fasteners' profit for comparable merchandise.  *Id.* at 13–14.  Commerce also rejected the second alternative, profit for other exporters or producers subject to the investigation, "because Oman Fasteners is the only respondent in this proceeding."  *Id.* at 14.  Accordingly, Commerce made use of the third alternative, deriving a profit figure using "any other reasonable method."  *Id.*

For its "reasonable method," Commerce elected to use the profit rate listed in another producer's financial statements.  To identify a specific producer and statement, Commerce applied four criteria that the agency announced in prior investigations:

> [(]1) the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products; [(]2) the extent to which the financial data of the surrogate company reflects sales in the home market and does not reflect sales to the United States; . . . [(]3) the contemporaneity of the data to the POI . . . [; and (4)] the extent to which the customer base of the surrogate company and the respondent are similar (*e.g.*, original equipment manufacturers versus retailers).

*Id.* (citing *Pure Magnesium from Israel*, 66 Fed. Reg. 49,349 (Dep't Commerce Sept. 27, 2001) (final determ.)).  The record included several statements from which Commerce could choose:

---

[7]     Commerce's reasoning applied to SG&A as well.  But because no party appeals Commerce's calculation of SG&A, the court addresses only profit.

[(]1) the 2013 financial statements of Al Jazeera, an Omani producer of steel bars
and pipes; [(]2) the 2012 financial statements of Larsen & Toubro, an Omani
construction conglomerate; [(]3) the 2013 financial statements for two Omani
producers of corrugated cartons; [(]4) the 2012 financial statements of Hitech, a
Thai producer of screws and rivets; [(]5) the 2012 financial statements of LSI, a
Thai producer of nails; [(]6) the financial statements for the fiscal year ending
March 31, 2014, of Sundram, an Indian producer of auto parts and fasteners; and
[(]7) the 2013 financial statements of Chun Yu and Sumeeko, two Taiwanese
producers of screws and fasteners.

*Id.*

Commerce eliminated the statements from Omani firms Al Jazeera and Larsen & Toubro,

as well as the Omani corrugated-carton producers, because none of the companies produced

merchandise comparable to the subject merchandise, steel nails. *Id.* at 15.  Commerce

acknowledged that generally it "would prefer to use the financial statements of a producer of

steel nails that primarily produces and sells steel nails in Oman," but noted that "such

information is not available on the record of this proceeding." *Id.*

Turning to third-country financial statements, Commerce discarded the statements of

Sundram, a producer of various automotive products, finding that Sundram's products were also

not sufficiently comparable.  *Id.* at 16.  Commerce also excluded the financial statements of LSI,

Chun Yu, and Sumeeko, each of which was only "partially translated."  *Id.*  Commerce cited "an

established practice of not considering financial statements unless they are completely

translated."  *Id.*  Commerce explained that "[t]ypically, the footnotes and disclosures included in

a company's financial statements" are "deemed vital to the users of those financial statements"

and that "we equate leaving any footnotes or disclosures untranslated to omitting them

completely, [because] . . . they are unavailable for either [Commerce] or the parties to a

proceeding to review or comment on."  *Id.*

Oman Fasteners disputed the rejection of the LSI statements.  Oman Fasteners asserted

that Commerce should accept the LSI statements because Commerce had accepted the statements

in a separate proceeding.  Oman Fasteners' Case Br. 29, P.R. 191 (March 11, 2015).  Oman

Fasteners also argued that, while it admittedly attempted to provide Commerce with fully

translated LSI statements only after the relevant deadlines had passed, Commerce should have

nevertheless accepted the translated statements.  *Id* at 35.  Commerce dismissed both arguments.

I&D Mem. 17.  Commerce characterized its decision to accept the partially translated statements

in a separate proceeding as a "mistake" that it was not bound to repeat, and it insisted that its

submission deadlines were firm.  *Id.*

Commerce was then left with only the statements of Hitech, a Thai producer of screws

and rivets.  *Id.* at 18.  Commerce found Hitech's "screws and other fasteners" to be comparable

to Oman Fasteners' merchandise.  *Id.*  Commerce therefore characterized the Hitech statements

as "the only useable financial statements of a producer of merchandise identical or comparable to

subject merchandise available on the record" and used the statements to calculate Oman

Fasteners' CV profit.  *Id.*

Finally, Commerce considered whether, because it was calculating profit under 19 U.S.C.

§ 1677b(e)(2)(B)(iii), the agency was required to calculate what is referred to as a "profit cap."

*Id.*  Profit calculated pursuant to § 1677b(e)(2)(B)(iii) "may not exceed the amount normally

realized by exporters or producers . . . in connection with the sale, for consumption in the foreign

country, of merchandise that is in the same general category of products as the subject

merchandise."  However, Commerce explained that, when the record lacks facts substantiating a

profit cap, the SAA authorizes Commerce to calculate profit on the basis of "facts available."

I&D Mem. 18–19 (citing SAA 841); *see also* 19 U.S.C. § 1677e(a) (allowing Commerce to

reach determinations using "facts otherwise available" in certain situations, including when

"necessary information is not available on the record").  Because Commerce determined that the

record in this case lacked the necessary data, it declined to apply a profit cap for Oman

Fasteners' constructed-value profit.

**B. Commerce Acted in Compliance with the Law and With the Support of Substantial Evidence When it Refused to Use Oman Fastener's Home-Market Sales to Calculate the CV Profit.**

Under 19 U.S.C. § 1677b(e)(2)(A), Commerce must use "the actual amounts . . . realized

by the specific . . . producer . . . for profits, in connection with the production and sale of a

foreign like product, in the ordinary course of trade, for consumption in the foreign country."

Commerce can resort to using the alternatives listed in section 1677b(e)(2)(B), as it did here,

only if such "actual data are not available."  Oman Fasteners' argues that Commerce was

obligated to calculate Oman Fasteners' CV profit using actual profit data from its home-market

sales of the subject merchandise.  Br. of Pl. Oman Fasteners, LLC in Supp. of Pl.'s Mot. for J.

Upon the Agency R. 11, ECF No. 29 ("Oman Fast. Br.").  But Commerce decided that, due to

the "extremely low volume" of those home-market sales, they "do not constitute a proper basis

for CV profit."  I&D Mem. 14.  The court sustains Commerce's decision to reject the home-

market data because the rejection stemmed from Commerce's reasonable interpretation and

application of an ambiguous statute.

Oman Fasteners argues that the words "not available" in the statute unambiguously

require Commerce to use home-market profit data when such data exist, regardless of the relative

or absolute significance of the sales the data reflects.  Oman Fast. Br. 13.  But Oman Fasteners'

argument ignores other language in the statute that is ambiguous.  Specifically, section

1677b(e)(2)(A) instructs Commerce to use actual profit data pertaining to a "foreign like

product" sold "in the ordinary course of trade."  The statute defines "ordinary course of trade" as

"the conditions and practices which, for a reasonable time prior to the export of the subject

merchandise, have been normal in the trade under consideration with respect to merchandise of

the same class or kind." 19 U.S.C. § 1677(15).  Imprecise terms like "reasonable" and "normal"

create ambiguity as to what exactly constitutes the "ordinary course of trade."  By extension, it is

unclear when home-market profit data is "available" for the "foreign like product" sold "in the

ordinary course of trade."[8]

      Because the statute is ambiguous, Commerce is entitled to a reasonable interpretation.

Commerce interprets the statute to render actual home-market profit data "unavailable" if the

producer's "volume of home market sales during the POI is too insignificant to reflect a

meaningful home market profit rate."  I&D Mem. 13.  This interpretation comports with the

statutory scheme, namely, that the record must provide Commerce with enough information to

determine whether sales were made under "conditions and practices which, for a reasonable time

prior to the export of the subject merchandise, have been normal in the trade," i.e., made in the

"ordinary course of trade."  If the record does not in fact support such a determination, then the

proffered "actual" home-market sales data cannot be said to comply with § 1677b(e)(2)(A), and

Commerce is correct to move on to the alternatives listed in § 1677b(e)(2)(B).  This

interpretation of the ambiguous statute, which aligns with the SAA, *see supra* note 8, is

reasonable. [9]

---

[8]     Oman Fasteners also cites the SAA which, like the statute, instructs Commerce to base
profit on "actual data."  *See* Oman Fast. Br. 14 (citing SAA 841).  However, the SAA also
provides that, in calculating CV profit under § 1677b(e)(2)(A), "Commerce may ignore sales that
it disregards as a basis for normal value" under § 1677b(a)(1).  SAA 839.  As discussed above,
Commerce appropriately rejected Oman Fastener's home-market sales as a basis for calculating
normal value under § 1677b(a)(1) because the sales comprised less than five percent of U.S.
sales.  Accordingly, under the SAA, Commerce may ignore these home-market sales, or consider
them "unavailable," when calculating CV profit under § 1677b(e).
[9]     Oman Fasteners argues that Commerce did not find that its sales were outside the
ordinary course of trade.  Oman Fast. Br. 14.  However, in the court's view, the final results
indicate such a finding.

Furthermore, Commerce reasonably applied the ambiguous statute.  As stated above, in

calculating normal value, section 1677b(a)(1)(C) considers home-market sales nonviable if the

sales constitute less than five percent of the aggregate quantity of sales to the U.S.  Record

evidence confirms that Oman Fasteners' home sales constituted [[        ]] of the company's

U.S. sales by volume, and [[        ]] by value.  *See* Oman Fasteners' CV Profit Submission Ex.

CV-1, P.R. 82 (Oct. 6, 2014).  Commerce considered these sales nonviable under section

1677b(a)(1)(C), leading Commerce to deem home-market sales unsuitable for use in calculating

CV profit under section 1677b(e)(2)(A).  Prelim. Mem. 2.  The meager proportion of home-

market sales is substantial evidence supporting Commerce's finding of a lack of viability.[10]

In summary, Commerce (1) reasonably interpreted the statute to consider nonviable

home-market sales "unavailable," (2) concluded with the support of substantial evidence that

Oman Fasteners' home-market sales were nonviable, and therefore, (3) correctly refused to use

Oman Fasteners' home-market sales to calculate CV profit and (4) correctly turned to the three

alternative methods for calculating CV profit listed under § 1677b(e)(2)(B).

**C.  The Court Remands for Commerce to Provide a More Thorough Explanation of its Reliance on Third-Country Profit Data Rather than Home-Market Profit Data.**

Oman Fasteners argues that, "[i]n relying on a third-country producer, to the exclusion of

all else, Commerce unlawfully ignored probative record evidence of the profit realized by

producers in Oman, the foreign country under investigation, contrary to the statute's requirement

that CV profit be representative of a respondent's experience in the home market," such that

"Commerce's decision was contrary to the statute and unsupported by substantial record

evidence."  Oman Fast. Br. 16.  Because it does appear that Commerce deviated from its prior

_____

[10]     The court does not address whether there is more to the standard for viability, specifically whether the application of metrics besides sales quantity could lead to a finding of nonviability.

practice without any explanation, the court remands for Commerce to either (1) change its

selection of profit data or (2) provide more explanation of its decision to rely on third-country

data.

As explained above, Commerce properly concluded that it could not rely on Oman

Fastener's home-market profit data for sales of the subject merchandise pursuant to 19 U.S.C. §

1677b(e)(2)(A) and correctly proceeded to the alternative methods listed in § 1677b(e)(2)(B).

Oman Fasteners argues that its home-market profit rate on sales of steel nails is the best

data available for calculating CV profit pursuant to the first alternative method, 19 U.S.C. §

1677b(e)(2)(B)(i).  Oman Fast. Br. 23.  But Commerce rejected option (i) because it did "not find

it reasonable to base CV profit and selling expenses on [Oman Fasteners'] extremely low volume

of home market sales in this case[, as] . . . such sales are not significant enough to represent a

meaningful home market profit rate."  I&D Mem. 14.  Commerce rejected option (ii) "because

Oman Fasteners is the only respondent in this proceeding."  *Id.*  Thus, Commerce chose option

(iii), which allowed Commerce to use "any other reasonable method" to calculate CV profit.  *Id.*

Four criteria, established in prior investigations, constituted Commerce's "reasonable

method" of selecting financial statements for CV profit:

> [(]1) the similarity of the potential surrogate companies' business operations and
> products to the respondent's business operations and products; [(]2) the extent to
> which the financial data of the surrogate company reflects sales in the home market
> and does not reflect sales to the United States; . . . [(]3) the contemporaneity of the
> data to the POI . . . [; and (4)] the extent to which the customer base of the surrogate
> company and the respondent are similar (*e.g.*, original equipment manufacturers
> versus retailers).

*Id.* (citing *Pure Magnesium from Israel*, 66 Fed. Reg. 49,349).

Commerce applied these criteria to its list of potential financial statements.  Commerce

conceded that it "would prefer to use the financial statements of a producer of steel nails that

primarily produces and sells steel nails in Oman." *Id*. at 15.  However, "because none of the

Omani companies on the record can reasonably be considered to produce or sell merchandise

identical or comparable to subject merchandise [i.e. steel nails], [Commerce] excluded those

companies from consideration as a data source for the calculation of CV profit and selling

expenses." *Id*.  Accordingly, Commerce discarded the statements of Al Jazeera, an Omani

producer and seller of "pipes, hollow sections and bar mill products using hot-rolled coils and

billets" because "[s]uch products . . . bear no relation to the production of steel nails using drawn

wire.  These products are produced using completely different equipment than steel nails . . . and

are used by customers in completely different applications (*e.g.*, large scale infrastructure

projects versus the fastening of wood in the building of homes)." *Id*.  Commerce also rejected

the financial statements of another Omani company, Larsen & Toubro, because the company

"execut[es] construction projects related to the oil and gas industries." *Id*.  Instead, Commerce

chose the financial statements of Hitech, a company that neither produces steel nails nor has any

production or sales in Oman, the home-market.  I&D Mem. 14–16.

     Oman Fasteners argues that Commerce violated its prior practice and "unlawfully

ignored the statutory and regulatory preference for home market profit experience when it used

the profit rate of a third-country producer with no connection to Oman." Oman Fast. Br. 16.

Oman Fasteners insists that "the statute and this Court's decisions make clear that any of the

alternatives applied pursuant to [§ 1677b(e)(2)(B)] must be representative of the respondent's

home market profit experience." *Id.* at 16–17.  Accordingly, "Commerce's resort to the profit

rate of a third-country producer (Hitech) that neither produced the foreign like product nor had

any connection whatsoever to Oman, and Commerce's simultaneous disregard of probative

record evidence of the profit rates realized by home market producers on their sales in Oman,

violated the statute's requirements and was unlawful." *Id.* at 17.

This argument raises legitimate concerns. "The goal in calculating CV profit is to

approximate the home market profit experience of the respondents." *Husteel Co., Ltd., v. United

States*, 39 CIT __, __, 98 F. Supp. 3d 1315, 1349 (2015). "Commerce's task [is] to estimate,

reasonably and fairly, a profit rate that [the respondent] would have realized from sales in its

home market." *Thai I-Mei Frozen Foods Co. v. United States*, 32 CIT 865, 883, 572 F. Supp. 2d

1353, 1368 (2008); *see also Thai I-Mei Frozen Foods Co. v. United States*, 616 F.3d 1300, 1307

(Fed. Cir. 2010) (explaining that "the alternative methods outlined in [§ 1677b(e)(2)(B)] all

'mimic' the methodology of [§ 1677b(e)(2)(A)] by giving alternatives to that attempt to track its

requirements").

In accordance with this goal, there are many instances of proceedings where Commerce

chose to rely on home-market data rather than third-country data to calculate CV profit. *See*

Oman Fast. Br. 19–22 (citing, among other proceedings, *Bottom Mount Combination

Refrigerator-Freezers from Mexico*, 77 Fed. Reg. 17,422 (Dep't Commerce March 26, 2012)

(final determ.) and *Electrolytic Manganese Dioxide from Australia*, 73 Fed. Reg. 47,586 (Dep't

Commerce Aug. 14, 2008) (final determ.)).[11]  But it appears that there is no instance of

Commerce ever successfully using exclusively third-country profit data of merely comparable

merchandise under § 1677b(e)(2)(B)(iii), as it did here.  Thus, Commerce departed from its prior

---

[11]      For example, in *Certain Steel Nails from the United Arab Emirates*, Commerce
calculated CV profit on steel nails.  77 Fed. Reg. 17,029 (Dep't Commerce March 23, 2012)
(final determ.) and accompanying I&D Mem. at cmt. 6.  Contrary to its method here, Commerce
first excluded the financial statements of companies outside the United Arab Emirates, the home
market, because Commerce "disagree[d] that the profit experience of these [third-country]
companies reflect[ed] the profit experience for a UAE company." *Id.*

practice when it prioritized third-country data from a producer of comparable merchandise over

home-market data.  Commerce failed to explain this departure.  Admittedly, Commerce

explained that the Omani companies did not produce identical or comparable merchandise.

Commerce also explained that Hitech produced comparable merchandise.  But this does not

adequately explain why third-country data of comparable merchandise better represents Omani

sales of steel nails than home-market sales data from Omani steel producers.  The court remands

for Commerce to either provide more explanation or to change its selection of financial

statements.

### D.   The Court Sustains Both Commerce's Rejection of the LSI Financial Statement and Commerce's Refusal to Allow Oman Fasteners to Supplement the Record Following the Deadline for Submitting Factual Information.

October 31, 2014 was the deadline for submitting factual information on CV profit.  I&D

Mem. 17.  Oman Fasteners timely submitted the partially translated financial statement of LSI, a

Thai producer of steel nails.  Oman Fasteners' Submission of Factual Info. Ex. SCV-6 ("Oman

Fast. Submission"), P.R. 110–112 (Oct. 31, 2014).  On February 12, 2015, after learning that

Commerce intended to reject the LSI statement due to its incomplete translation, Oman Fasteners

sought to submit a complete translation of the LSI statement.  Oman Fasteners' Request to

Permit New Factual Info., P.R. 176–177 (Feb. 12, 2015).  Commerce deemed the submission

untimely and, on that basis, rejected the translated LSI statement.  Commerce Letter to Oman

Fasteners Rejecting New Factual Info., P.R. 178 (Feb. 13, 2015).  Oman Fasteners again

requested leave to submit the LSI statement, but Commerce did not respond.  Oman Fasteners'

Revised Request to Permit New Factual Info., P.R. 180 (Feb. 18, 2015).

As discussed above, Commerce discarded the financial statement of LSI because the

statement was only partially translated.  The LSI statement reflected a profit rate of 2.08 percent

on sales of steel nails.  Oman Fast. Submission Attach. 9.  Commerce eventually chose the

Hitech statements, which resulted in a CV profit rate of 19.74 percent.  *See* Prelim. Mem. 5; *see*

*also* Oman Fasteners' Case Br. 48.  This profit rate was significantly higher than the profit rates

of the home-market companies on the record.  *See* Oman Fasteners' Case Br. Ex. 1.

     Oman Fasteners disputes Commerce's treatment of the LSI statement.  First, Oman

Fasteners argues that Commerce erred in rejecting the partially translated LSI statement.

Second, Oman Fasteners insists that Commerce abused its discretion when barring the

submission of the fully translated LSI statement.  The court disagrees on both counts.

    1.  *Commerce Acted Reasonably in Rejecting the LSI Statement.*

     To support its contention that Commerce erred in rejecting the partially translated LSI

statement, Oman Fasteners cites two previous proceedings involving steel nails.  Oman Fast. Br.

33 (citing *Certain Steel Nails from the People's Republic of China*, 79 Fed. Reg. 19,316 (Dep't

Commerce Apr. 8, 2014) (final results) and accompanying I&D Mem. ("*China Nails AR4*") and

*Certain Steel Nails from the People's Republic of China*, 80 Fed. Reg. 18,816 (Dep't Commerce

Apr. 8, 2015) (final results) and accompanying I&D Mem. ("*China Nails AR5*")).  In those two

proceedings, Commerce rejected the same Hitech statement that it accepted here, and it accepted

the same partially translated LSI statement that it rejected here.  Commerce rejected the Hitech

statements in the previous proceedings because Hitech produces merely comparable

merchandise, and it accepted the LSI statement in the previous proceedings because LSI

produces identical merchandise.  *See, e.g.*, *China Nails AR4* at cmt. 2.  Oman Fasteners

highlights that Commerce "previously determined, when faced with the identical financial

statement and company records of LSI and Hitech that are on the record here, that 'Hitech's

financial statements are not the best information on the record.'" Oman Fast. Br. 33 (quoting

*China Nails AR4* at cmt. 2).  Oman Fasteners characterizes Commerce's previous stance as a

"consistent" determination that the partially translated LSI statement is "the most probative third-

country source to determine profit ratios for producers of steel nails, the subject merchandise."

*Id.* at 34.  Thus, Oman Fasteners maintains that Commerce violated an established practice.

"'An action . . . becomes an 'agency practice' when a uniform and established procedure

exists that would lead a party, in the absence of notification of change, reasonably to expect

adherence to the established practice or procedure." *Ranchers-Cattlemen Action Legal Found. v.*

*United States*, 23 CIT 861, 884–85, 74 F. Supp. 2d 1353, 1374 (1999).  Oman Fasteners points to

only two proceedings, but this court has previously held that "two prior determinations are not

enough to constitute an agency practice that is binding on Commerce." *Shandong Huarong*

*Mach. Co. v. United States*, 30 CIT 1269, 1293 n.23, 435 F. Supp. 2d 1261, 1282 n.23 (2006).

Consequently, Oman Fasteners failed to demonstrate an established practice that Commerce

violated.  Further, Commerce provided a reasonable and persuasive explanation for the

difference in treatment, stating that the "use of partially translated financial statements in *China*

*Nails AR4* was contrary to our established practice. . . . The Department is not obligated to accept

an incorrect methodology and perpetuate a mistake because it was accepted in a previous

proceeding." I&D Mem. 17.  Moreover, even if Commerce has a practice regarding the

treatment of the LSI statement—an unlikely event given the fact-intensive nature of the issue—

Commerce persuasively argues that it also has at least as prevalent a practice of refusing to use

partial translations of financial statements.  *See id.* at 16 n.63.  Thus, it is unlikely that Oman

Fasteners reasonably expected adherence to an "established practice" of always preferring to use

incomplete translations of a specific company's financial statements.

Nevertheless, Oman Fasteners argues that, rather than summarily disregard the partially-translated LSI statement, Commerce "must compare the probative value of a partially translated statement with the deficiencies of other potential financial statements before concluding that the partially translated statement should be disregarded." Oman Fast. Br. 36 (citing *CP Kelco US, Inc. v. United States*, Slip Op. 15-27, 2015 WL 1544714, at *7 (CIT Mar. 31, 2015)). Thus, Oman Fasteners maintains that Commerce lacked the support of substantial evidence when it prioritized the fully translated Hitech statement, which covered merely comparable merchandise, over the partially translated LSI statement, which covered identical subject merchandise. *Id.*

But Oman Fasteners excluded critical portions of *CP Kelco*. The court recognized that Commerce has "a past practice of rejecting those statements that are missing [vital] information." *CP Kelco*, 2015 WL 1544714, at *8 n.7 (citation omitted). For example, "Commerce has often deemed financial statements to be unusable when they are missing all or many accounting notes." *Id.* (listing proceedings where this occurred). *See also* Def.'s Resp. in Opp'n to Pl.'s Mot. for J. Upon the Agency R. 34 n.8, ECF No. 43 ("Gov't Br.") (listing proceedings where Commerce refused to use partially translated statements). In *CP Kelco*, however, substantial evidence did not support a finding that the statements at issue were in fact missing vital information. *See CP Kelco*, 2015 WL 1544714, at *6. The court found that the extent of the untranslated portions of the statements at issue was "two paragraphs at the bottom of accounting note twelve, concerning depreciation of assets" and that "[a]ccounting note twelve nonetheless contained a fully translated depreciation schedule." *Id.* On these facts, the court held that Commerce was required to compare and contrast the merits and deficiencies of each of the available statements on the record.

In stark contrast here, Commerce found that "for LSI, the audit report was left untranslated, as well as several financial statements and all footnotes with the exception of a note related to income taxes." I&D Mem. 16. This is substantial evidence in support of Commerce's finding that the LSI statement lacked vital information, "preclud[ing] the Department from fully evaluating the appropriateness of the financial information set forth in these financial statements." *Id.* For that reason, Commerce had no obligation to compare the LSI statement to the Hitech statements, as Oman Fasteners argues. Commerce therefore acted reasonably and in accordance with prior practice when it discarded the LSI statement.

   2. *Commerce Did Not Err in Precluding Oman Fasteners from Adding to the Record after the Submission Deadline.*

Oman Fasteners argues that "Commerce's refusal to accept a fully translated LSI statement on the record was an abuse of discretion and contrary to law." Oman Fast. Br. 38. Oman Fasteners explains that, at the time it provided the timely submission of the partially translated LSI statement, Commerce "had already expressly relied upon the identical partially translated 2012 LSI statement as a proper basis for the calculation of profit in at least two prior and concurrent proceedings on steel nails." *Id.* Oman Fasteners insists that because "Commerce provided no notice to Oman Fasteners prior to the factual information deadline," Commerce "denied Oman Fasteners a fair opportunity to respond to a significant change in Commerce's position." *Id.* at 41–42. Because Commerce, in the *China Nails* proceedings, permitted the parties to provide complete translations of the LSI statement after the deadline for submitting CV profit information, Oman Fasteners argues that "Commerce's disparate and unequal treatment of parties in the same circumstances in two different proceedings was arbitrary and an abuse of discretion." *Id.* at 42.

This Court reviews whether Commerce properly excluded evidence as untimely under the

abuse of discretion standard.  *See Artisan Mfg. Corp. v. United States*, 38 CIT __, __, 978 F.

Supp. 2d 1334, 1344 (2014).  "Thus, while deferring to Commerce's necessary discretion to set

and enforce its deadlines, the court will review on a case-by-case basis whether the interests of

accuracy and fairness outweigh the burden placed on the Department and the interest in finality."

*Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 36 CIT __, __, 815 F. Supp. 2d 1342,

1365 (2012).

Commerce provided the following explanation for its decision to preclude the submission

of the fully translated LSI statement:

> Oman Fasteners was afforded ample opportunity to file fully translated LSI
> financial statements on the record of this proceeding within the deadlines
> specified by the Department's regulations.  The Department established a
> deadline of October 31, 2014, for all parties to submit CV profit and selling
> expense information.  Oman Fasteners itself acknowledged this deadline in a
> letter to the Department, as it specifically cited to it as a reason to reject factual
> information regarding CV profit and selling expenses submitted by the Petitioner
> after the deadline.  Further, under the Department's regulations, all parties were
> permitted to file new factual information up to 30 days prior to the preliminary
> determination (in this case, November 17, 2014) provided that they explained
> why that information did not meet the definition of the information provided in
> response to the Department's specific request for CV profit information.  Oman
> Fasteners failed to timely submit fully translated financial statements within either
> of these deadlines even though evidence on the record indicates that it had access
> to a full translation of the LSI financial statements well before the established
> deadlines.  It was not until February 12, 2015, several months after the deadline
> for CV profit and selling expense information, that Oman Fasteners attempted to
> file a fully translated version of the LSI financial statements.  As such, the
> Department rejected the submission as untimely.

I&D Mem. 17.

The court finds that Commerce did not abuse its discretion in denying Oman Fasteners'

request to supplement the record.  Oman Fasteners claims that it relied on Commerce's alleged

established practice of accepting partially translated LSI statements.  Reply Br. of Pl. Oman

Fasteners, LLC in Supp. of Pl.'s Mot. for J. on the Agency R. ("Oman Fast. Reply Br.") 17.

However, as established above, Commerce has no practice of always accepting partially

translated LSI statements, which makes any reliance on this ostensible practice by Oman

Fasteners unreasonable.  On the contrary, Commerce's regulations provided ample notice to

Oman Fasteners that submitting partial translations may result in the rejection of the statements.

Under 19 C.F.R. § 351.303(e),

> [a] document submitted in a foreign language must be accompanied by an English
> translation of the entire document or of only pertinent portions, where
> appropriate, unless the Secretary waives this requirement for an individual
> document.  A party must obtain the Department's approval for submission of an
> English translation of only portions of a document prior to submission to the
> Department.

Oman Fasteners never sought permission before submitting partial translations.  Oman Fasteners

could have submitted a fully translated LSI statement but chose not to do so within the deadline.

Commerce did not abuse its discretion by enforcing its clear deadlines in a manner that, contrary

to Oman Fastener's claims, violated no established practice.  Consequently, the court finds that

Commerce acted reasonably.

**E.  If the Profit Cap Issue Remains Disputed on Remand, Commerce Must Provide a
     More Thorough Explanation for its Determination.**

As explained above, Commerce calculated the CV profit under 19 U.S.C. §

1677b(e)(2)(B)(iii), which allows Commerce to calculate CV profit using "any other reasonable

method."  However, the statute specifies that "the amount allowed for profit may not exceed the

amount normally realized by exporters or producers (other than [Oman Fasteners] . . . ) in

connection with the sale, for consumption in the foreign country, of merchandise that is in the

same general category of products as the subject merchandise."  *Id.*  This is called a "profit cap."

The profit cap "serves to prevent the various possible calculation methods from yielding

anomalous results that stray beyond the amount normally realized from sales of merchandise in

the same general category." *Atar S.R.L. v. United States*, 730 F.3d 1320, 1327 (Fed. Cir. 2013)

(quoting another source).

> Commerce declined to calculate and apply a profit cap, explaining that
>
> the SAA makes clear that the Department may calculate CV profit without a
> profit cap, particularly, as is the case here, where there is no viable domestic
> market in the exporting country for merchandise that is in the same general
> category of products as the subject merchandise.  In numerous previous cases, the
> Department calculated CV profit under section [19 U.S.C. § 1677b(e)(2)(B)(iii)]
> of the Act without quantifying the profit cap, as facts available.  The legislative
> history indicates that Congress recognized that there may be instances where, due
> to a lack of data, the Department would need to use facts available and calculate a
> CV profit rate pursuant to section (iii) of the Act without quantifying a profit cap.
> With respect to this provision of the statute, Congress intended the profit cap to
> be: (1) based on home market sales information of the same general category of
> products as the subject merchandise, (2) non-aberrational to the industry under
> consideration (*i.e.*, "the amount normally realized"), and (3) not based on the data
> of the respondent for which the Department is calculating CV.  Accordingly, we
> have examined the available data in this case and conclude that there is no
> information that would meet these standards.  As such, we are unable to calculate
> the profit normally realized by producers other than Oman Fasteners in
> connection with domestic market sales of merchandise in the same general
> category as the subject merchandise.  Consequently, in accordance with the
> statute, we have not quantified a profit cap in applying the statutory alternative to
> determine CV profit for Oman Fasteners.

I&D Mem. 18–19 (citations omitted).  Commerce also cites prior proceedings in which, as here,

it calculated CV profit under § 1677b(e)(2)(B)(iii) without quantifying the profit cap.  *Id.* at 19

n.79.[12]

---

[12]     *Stainless Steel Plate in Coils from Belgium*, 77 Fed. Reg. 73,013 (Dep't Commerce Dec.
7, 2012) (final results) and accompanying I&D Mem. at cmt. 3; *Certain Lined Paper Products
from India*, 76 Fed. Reg. 10,876 (Dept. Commerce Feb. 28, 2011) (final results) and
accompanying I&D Mem. at cmt. 3; *Bottom Mount Combination Refrigerator-Freezers from
Mexico*, 77 Fed. Reg. 17,422 (Dep't Commerce March 26, 2010) (final determ.) and
accompanying I&D Mem. at cmt. 26.

Oman Fasteners argues that "[t]he statute provides no exception that permits Commerce to ignore the calculation of a profit cap, even where Commerce believes there is no suitable home market profit data." Oman Fast. Br. 44.  Oman Fasteners insists that the Hitech financial statements yielded an anomalous CV profit rate and that substantial record evidence warranted a cap on that figure.  *Id.* at 46.

Because the court is remanding Commerce's choice of the Hitech financial statements over home-market information, *see supra* Part II(C), the profit cap issue may be rendered moot. If on remand Commerce selects financial statements yielding a CV profit figure within a range that Oman Fasteners finds appropriate, the profit cap issue may be resolved.  If however the issue remains disputed between the parties, then Commerce must provide a more thorough explanation for its determination, in accordance with the below guidance.

While Commerce is correct that, under certain circumstances, it may decline to calculate a profit cap, it may do so only when it offers a thorough explanation as to why the available data prevents such a calculation.  *See Husteel Co. v. United States*, 39 CIT __, __, 98 F. Supp. 3d 1315, 1348 (2015).  This court has reasoned that if CV profit may be selected using "facts available" under § 1677b(e)(2)(iii), then "it would seem a 'facts available' profit cap may also be used." *Geum Poong Corp. v. United States*, 25 CIT 1089, 1097, 163 F. Supp. 2d 669, 679 (2001).  Therefore, "[w]here the record lacks data on profit normally realized by other companies on sales of the same general category of products, Commerce still must attempt to comply with the profit cap requirement through the use of facts otherwise available." *Atar S.R.L. v. United States*, 34 CIT 465, 469, 703 F. Supp. 2d 1359, 1364 (2010).  In sum, this court has made clear that the profit cap is a statutory requirement that cannot be lightly cast aside.

Here, Commerce expounded on the legal framework applicable to profit caps, but its discussion of the record is limited to the statement that "we have examined the available data in this case and . . . . we are unable to calculate the profit normally realized by producers other than Oman Fasteners in connection with domestic market sales of merchandise in the same general category as the subject merchandise."  I&D Mem. 19.  As Oman Fasteners points out, this court has held that terse explanations, nearly identical to the one provided by Commerce here, are insufficient.  *See* Oman Fast. Br. 44 (citing *Husteel*, 39 CIT at __, 98 F. Supp. 3d at 1349).  Indeed, Commerce's explanation only establishes that "necessary information is not available on the record" such that Commerce "shall . . . use the facts otherwise available in reaching the applicable determination."  *See* 19 § U.S.C. 1677e(a)(1).  But Commerce's explanation does not account for its decision to not make use of "facts otherwise available" in order to ensure that the selected CV profit data does not "yield[ ] anomalous results that stray beyond the amount normally realized from sales of merchandise in the same general category."  *Atar S.R.L. v. United States*, 730 F.3d 1320, 1327 (Fed. Cir. 2013) (citation omitted).  A thorough explanation seems especially appropriate here, where the chosen CV profit is several multiples larger than the other profit figures on the record.  Accordingly, should the profit cap issue remain disputed on remand, Commerce must provide a more fulsome explanation of its determination.

## CONCLUSION

The court remands for further explanation or modification of Commerce's decision to rely on third-country profit data rather than home-market profit data.  Unless the issue is rendered moot, the court orders Commerce to provide a more thorough explanation for any determinations concerning the profit cap.  The court sustains Commerce on all other issues.

Accordingly, it is hereby,

**ORDERED** that the final determination of Commerce, published as *Certain Steel Nails from the Sultanate of Oman*, 80 Fed. Reg. 28,972 (Dep't Commerce May 20, 2015) (final determ.) is hereby REMANDED to Commerce for reconsideration in accordance with this Opinion and Order; it is further

**ORDERED** that Plaintiff's Motion for Judgment on the Agency Record Under USCIT Rule 56.2 is DENIED; it is further

**ORDERED** that Defendant-Intervenor's Motion for Judgment on the Agency Record Under USCIT Rule 56.2 is GRANTED in part and DENIED in part in accordance with this Opinion and Order; it is further

**ORDERED** that Commerce shall issue a redetermination ("Remand Redetermination") in accordance with this Opinion and Order that is in all respects supported by substantial evidence and in accordance with law; it is further

**ORDERED** that Commerce shall modify or further explain its decision to rely on third-country profit data rather than home-market profit data; it is further

**ORDERED** that Commerce shall provide a thorough explanation of any profit cap determinations, should that issue remain disputed between the parties; it is further

**ORDERED** that Commerce shall have ninety (90) days from the date of this Opinion and Order in which to file its Remand Redetermination, which shall comply with all directives in this Opinion and Order; that the Plaintiff and Defendant-Intervenors shall have thirty (30) days from the filing of the Remand Redetermination to file comments thereon; and that the Defendant shall

have thirty (30) days from the filing of Plaintiff's and Defendant-Intervenors' comments to file

comments.


   /s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated:  January 26, 2017
New York, New York