Slip Op. 17-154

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| MID CONTINENT STEEL & WIRE, INC.,<br><br>                                              Plaintiff,<br><br>        v.<br><br>UNITED STATES,<br><br>                                                Defendant,<br><br>        v.<br><br>OMAN FASTENERS, LLC<br><br>                                    Defendant-Intervenor. | Before: Richard W. Goldberg, Senior Judge<br>Consolidated Court No. 15-00214<br><br>**PUBLIC VERSION** |

## **OPINION**

[Defendant-Intervenor's motion for judgment on the agency record is denied; the final results of redetermination pursuant to court order of the United States Department of Commerce is sustained.]

Dated:  November 20, 2017

    *Adam H. Gordon*, The Bristol Group PLLC, of Washington, D.C., argued for plaintiff. With him on the brief was *Ping Gong*.

    *Mikki Cottet*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant. With her on the brief were *Benjamin C. Mizer*, Principle Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director.

    *Michael P. House* and *David J. Townsend*, Perkins Coie LLP, of Washington, D.C., argued for defendant-intervenor. With them on the brief was *David S. Christy, Jr.*

    Goldberg, Senior Judge:  This matter returns to the court following a remand of the final determination of the U.S. Department of Commerce ("Commerce" or "the Department") in its

antidumping investigation of certain steel nails from the Sultanate of Oman.  On May 23, 2017, Commerce filed its Final Results of Redetermination Pursuant to Court Order, ECF No. 95 ("*Remand Redetermination*").  The prior opinion of this court more completely sets forth the facts underlying this matter.  *See Mid Continent Steel & Wire, Inc. v. United States*, 41 CIT __, 203 F. Supp. 3d 1295 (2017) ("*Mid Continent I*").  The court presumes familiarity with that opinion and repeats only the facts critical to the disposition of this matter.  For the reasons below, the court sustains the determinations in Commerce's *Remand Redetermination*.

## BACKGROUND

In June of 2014, Commerce initiated an antidumping duty investigation on steel nails from the Sultanate of Oman ("Oman").  *Certain Steel Nails from India, the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, the Republic of Turkey, and the Socialist Republic of Vietnam*, 79 Fed. Reg. 36,019 (Dep't Commerce June 25, 2014) (initiation).  Commerce selected Defendant-Intervenor, Oman Fasteners, LLC ("Oman Fasteners") as the mandatory respondent.  Antidumping Duty Investigation of Certain Nails from the Sultanate of Oman Resp't Selection, P.R. 51 (July 28, 2014).

On December 29, 2014, Commerce issued its preliminary determination of sales at less than fair value.  *Certain Steel Nails from the Sultanate of Oman*, 79 Fed. Reg. 78,034 (Dep't Commerce Dec. 29, 2014) (prelim. determ.) and accompanying Issues and Decision memorandum, P.R. 150 (Dec. 17, 2014).

On May 20, 2015 Commerce issued its final determination.  *Certain Steel Nails from the Sultanate of Oman*, 80 Fed. Reg. 28,972 (Dep't Commerce May 20, 2015) (final determ.) ("*Final Determination*") and accompanying Issues and Decision memorandum ("I&D Mem."), P.R. 218–220 (May 13, 2015).  In the *Final Determination*, among other decisions, Commerce

determined it could only calculate constructed value ("CV") profit using the "any other reasonable method" alternative provided for in 19 U.S.C. § 1677b(e)(2)(B)(iii). *See* I&D Mem. 14. Applying its chosen method, Commerce declined to use Oman Fastener's preferred CV profit rate data, opting instead to use the financial statements of a Thai company, Hitech. *Id.* at 12. Commerce also determined that the record contained insufficient data with which to calculate a "profit cap." *Id.* at 18–19.

Oman Fasteners and Plaintiff, Mid Continent Steel & Wire, Inc., separately challenged certain determinations in the *Final Determination* and each moved for judgment on the agency record under USCIT Rule 56.2. Br. of Oman Fasteners, LLC in Supp. of Mot. for J. upon the Agency R., ECF No. 30 ("Oman Fast. 56.2 Br."); Br. In Supp. of Rule 56.2 Mot. for J. upon the Agency R. of Mid Continent Steel & Wire, Inc. 19–20, ECF No. 26-1. Specifically, Oman Fasteners argued that Commerce erred when it (i) refused to use Oman Fastener's own home-market sales of steel nails to calculate the CV profit of the steel nails, (ii) relied on third-country profit data of comparable products instead of home-market profit data to calculate CV profit, (iii) rejected the partially translated financial statement of L.S. Industry Co Ltd. ("LSI"), a Thai producer of steel nails, and refused to allow Oman Fasteners to supplement the record with the fully translated LSI statement, and (iv) refused to apply a profit cap to the CV profit rate. Oman Fast. 56.2 Br. 9–11.

The court remanded issues (ii) and (iv) to Commerce. *Mid Continent I*, 41 CIT __, 203 F. Supp. 3d at 1308–11, 1314–17. Specifically, the court found that Commerce did "not adequately explain why third-country data of comparable merchandise better represents Omani sales of steel nails than home-market sales data from Omani steel producers." *Id.* at 1310. The court therefore ordered Commerce to either change its selection of profit data or provide a more

thorough explanation of its reliance on third-country profit data. In addition, the court found that Commerce failed to adequately explain why it could "not make use of 'facts otherwise available' in order to" calculate a profit cap. *Id.* at 1316. Thus, the court further ordered that, unless the issue were rendered moot on remand, Commerce must provide a more thorough explanation for any determinations concerning a profit cap. *Id.* The court sustained the remainder of the contested determinations of Commerce. *Id.*

In its *Remand Redetermination*, Commerce continues to use third-country data to calculate a CV profit rate. *Remand Redetermination* 4–11. And Commerce continues to maintain that there is insufficient data with which to calculate a profit cap. *Remand Redetermination* 11–14. Oman Fasteners challenges these decisions, insisting that "Commerce's redetermination fails to implement this Court's instructions on remand and remains unsupported by substantial evidence and contrary to law." Comments of Oman Fasteners LLC in Opp. to the Commerce Dep't Remand Redetermination 1, ECF No. 100 ("Oman Fast. Cmts."). However, as explained below, Commerce provided reasonable, and more robust, explanations for these decisions. Therefore, the court sustains the challenged determinations in Commerce's *Remand Redetermination*.

## DISCUSSION

### I. The Court Sustains Commerce's Decision to Use the Hitech Financial Statements to Calculate CV Profit Rate

Ideally, when selecting data to calculate CV profit under 19 U.S.C. § 1677b(e)(2)(B)(iii), Commerce would use data that reflects all of the factors of the *Pure Magnesium/CTVs from Malaysia* tests: similar business and products, sales in the respondent's home market, contemporaneity, and similar customer base. *See Remand Redetermination* 22 (citing *Notice of Final Determination of Sales at Less than Fair Value: Pure Magnesium from Israel*, 66 Fed.

Reg. 49,349 (Dep't Commerce Sept. 27, 2001) (final determ.) and accompanying Issues and Decision Memorandum cmt. 8; *Notice of Final Determination of Sales at Not Less than Fair Value: Certain Color Television Receivers from Malaysia*, 69 Fed. Reg. 20,592 (Dep't Commerce Apr. 16, 2004) (final determ.) and accompanying Issues and Decision Memorandum cmt. 26). However, the record does not always contain ideal surrogate data. Such is the case here. In the *Final Determination*, Commerce stated that, in choosing from the financial statements available on the record, "we first considered which of the proposed companies produces products that are in the same general category of products as the subject merchandise . . . ." I&D Mem. 15. As a result, Commerce eliminated certain financial statements from companies with sales in Oman. However, Commerce did not explain why it started with, and seemingly prioritized, financial statements reflecting the same general category of products as the subject merchandise over those reflecting sales in the home market, albeit of unrelated products.

     In remanding this issue to Commerce, the court noted that "[t]he goal in calculating CV profit is to approximate the home market profit experience of the respondents." *Mid Continent I*, 41 CIT at __, 203 F. Supp. 3d at 1310 (quoting *Husteel Co., Ltd., v. United States*, 39 CIT __, __, 98 F. Supp. 3d 1315, 1349 (2015)). The court also highlighted a handful of proceedings in which Commerce appeared to have prioritized home market data over third-country data to calculate CV profit. *Id.* In light of Commerce's thin explanation for its choice of the Hitech statements and in light of Commerce's apparent practice in prior proceedings, the court remanded for Commerce to select different financial statements or to provide a more thorough explanation of its decision. Commerce elected for the latter option.

In its *Remand Redetermination*, Commerce explains that two companies that produce comparable products will share a number of similarities in their respective production experiences. *Remand Redetermination* 4. For example, two companies producing similar products can be expected to "consume the same or similar raw material inputs." *Id.* And those raw materials "would be subject to the same supply and demand conditions in the global marketplace . . . ." *Id.* These two hypothetical companies, Commerce further explains, would also likely use similar "plant facilities, machinery, and equipment," subjecting the companies to "similar levels of capital expenditures." *Id.* at 5. Commerce noted a number of additional expected commonalities shared by companies producing similar products. *Id.*

Commerce then applied its reasoning to Oman Fasteners, Hitech, and the companies with sales in Oman. And in each case, Commerce persuasively demonstrated that Hitech is the superior surrogate, despite the fact that it has no sales in Oman. For example, Commerce explained that Oman Fasteners and Hitech would both be purchasing "drawn wire," the raw material input for Oman Fastener's nails and Hitech's screws, "in the same global marketplace, subject to the same market conditions and the same pricing fluctuations." *Id.* In contrast, the companies with sales in Oman, whose financial statements Oman Fasteners prefers, would not consume drawn wire as a raw material input, and would therefore likely be subject to different global market fluctuations in the purchase of their raw material inputs. Thus, Commerce reasonably concluded that "neither Al Jazeera nor Larsen & Toubro" would be comparable to Oman Fasteners "in terms of inputs for the production process, company cost structure, use of the produced product, and industry in which the produced product is sold . . . ." *Id.* at 16.

Importantly, Commerce also distinguished prior proceedings in which it has selected home-market data over third-country data to calculate CV profit. *Id.* at 8–10. In those prior

proceedings, Commerce did not prioritize home-market data *per se*. Rather, it prioritized the data on the record that best reflected the respondent's production experience. In many prior proceedings, the best data happened to also reflect respondent's home market. As Commerce has now adequately explained, here, the best data is third-country data. In other words, data reflecting home-market sales may ultimately fail to best "approximate the home market profit experience of the respondents." In such cases, selection of third-country data may constitute a "reasonable method" of calculating CV profit under § 1677b(e)(2)(B)(iii).

Oman Fasteners makes a number of arguments in support of its position that Commerce's continued selection of the Hitech statements is unlawful. Oman Fast. Cmts. 6–26. The court will address those arguments in turn.

First, Oman Fasteners argues that Commerce again ignored the statutory preference for home market data and that Commerce is wrong in asserting that the statute places equal importance on product comparability and home market sales. Specifically, Oman Fasteners argues that "all three statutory alternatives [in 19 U.S.C. § 1677b(e)(2)(B)] explicitly ground the measure of CV sources to the home market, while permitting the use of sources that do not narrowly reflect the particular merchandise under investigation." Oman Fast. Cmts. 8. In fact, while the first two alternatives call for home market data, the third alternative does not require that the selected data actually reflect home market sales. It only requires a "reasonable method" of calculation, subject to a home market-based profit cap. 19 U.S.C. § 1677b(e)(2)(B)(iii). Of course, when reliable data reflecting home market sales of a comparable product are available on the record, selection of third-country data is less likely to constitute a "reasonable method." However, in light of the data available on the record of this proceeding, Commerce's selection of third-country data was not contrary to the statute.

Oman Fasteners also argues that, even if the statute gives equal weight to product comparability and home market sales, Commerce's methodology in its *Remand Redetermination* in fact reflects an unlawful preference for product comparability *over* home market sales. In support, Oman Fasteners points out that in the *Remand Redetermination*, as in the *Final Determination*, Commerce explained that it "*first* consider[ed] whether each of the proposed companies produces products that are in the same general category of products as the subject merchandise . . . ." Oman Fast. Cmts. 10 (quoting *Remand Redetermination* 4).

However, in light of Commerce's explanation concerning the specific data available to it on the record, the issue of prioritization is academic. The data from Omani companies appears to have little to no relationship to the subject merchandise. Regardless of the order of factors applied, the Hitech statements could emerge as the best available data on the record.[1]

Ultimately, Commerce marshalled substantial evidence and a reasoned explanation for its determination that the Hitech statements are the best among imperfect choices on the record for the purpose of calculating CV profit. Accordingly, the court sustains Commerce's determination.

---

[1] Oman Fasteners also insists that Commerce gave insufficient weight to the possibility that the Hitech data is tainted by subsidies. Oman Fast. Cmts. 18–19. However, Commerce thoroughly and reasonably explained that its use of the Hitech statements here (i) in fact accounts for, and offsets, any countervailing subsidies and (ii) is in accordance with well-established past practice. *See* Def.'s Resp. to Comments on the Remand Redetermination 23, ECF No. 101.
   Additionally, the court does not agree with Oman Fasteners that Commerce's selection of data was made pursuant to a new methodology. *See* Oman Fast. Cmts. 23–26. Although Commerce previously failed to fully explain the methodology applied here, the *Remand Redetermination* makes clear that there is ultimately nothing novel about Commerce's selection of the Hitech statements. Therefore, the court does not find that Oman Fasteners is entitled to a remand to supplement the record.

II.     **The Court Sustains Commerce's Decision Not to Calculate a Profit Cap**

As explained above, Commerce calculated the CV profit under 19 U.S.C. § 1677b(e)(2)(B)(iii), which allows Commerce to calculate CV profit using "any other reasonable method." However, this provision specifies that "the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than [Oman Fasteners]) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise . . . ." 19 U.S.C. § 1677b(e)(2)(B)(iii). This profit cap "serves to prevent the various possible calculation methods from yielding anomalous results that stray beyond the amount normally realized from sales of merchandise in the same general category." *Atar S.R.L. v. United States*, 730 F.3d 1320, 1327 (Fed. Cir. 2013) (citation and internal quotation marks omitted).

In the *Final Determination*, Commerce declined to calculate and apply a profit cap, explaining that:

> [T]he SAA makes clear that the Department may calculate CV profit without a profit cap, particularly, as is the case here, where there is no viable domestic market in the exporting country for merchandise that is in the same general category of products as the subject merchandise.

I&D Mem. 18.

The court remanded, explaining that, while Commerce "may decline to calculate a profit cap, it may do so only when it offers a thorough explanation as to why the available data prevents such a calculation." *Mid Continent I*, 41 CIT at __, 203 F. Supp. 3d at 1315 (*citing Husteel Co.*, 39 CIT at __, 98 F. Supp. 3d at 1348). Specifically, Commerce had failed to explain why it did not at least attempt to make use of "facts otherwise available" to calculate a profit cap. *Mid Continent I*, 41 CIT at __, 203 F. Supp. 3d at 1316 (citation omitted).

In its *Remand Redetermination*, Commerce explains that, in accordance with the court's direction, it "further examined the evidence presented by all parties to determine whether there is any source on the record of this proceeding to serve as a suitable facts available profit cap." *Remand Redetermination* 11. Like CV profit, an ideal profit cap reflects home market sales "of merchandise that is in the same general category of products as the subject merchandise." 19 U.S.C. § 1667b(e)(2)(B)(iii). For essentially the same reasons that Commerce selected the Hitech financial statements to calculate CV profit, Commerce continues to find no suitable data on the record to "cap" the Hitech profit rate.

Although Hitech's profit rate does not reflect sales in Oman Fasteners' home market, Commerce explains that there is no reason to believe that the home market data on the record would fulfil the purpose of the statutory profit cap. For its part, Oman Fastener's argues that Commerce should have used profit rates from (1) the *Steel Nails from China* proceedings, (2) Al Jazeera and Larsen & Toubro, or (3) Oman Fasteners' home market sales of steel nails, to calculate a profit cap. Oman Fast. Cmts. 27. As discussed above, *supra* Section I, and in the court's previous opinion, *Mid Continent I*, 41 CIT at __, 203 F. Supp. 3d at 1307–11, deficiencies rendered these data unreliable as a source of CV profit. As Commerce has now adequately explained, these same deficiencies also render these data unsuitable as "facts otherwise available" for the purpose of calculating a profit cap.

To begin, the profit rate used in the administrative reviews of *Steel Nails from China* was sourced, at least in part, from the financial statements of LSI. *See, e.g.*, *Certain Steel Nails from the People's Republic of China*, 79 Fed. Reg. 19,316 (Dep't Commerce Apr. 8, 2014) (final results)). Throughout this proceeding, Oman Fasteners has argued that Commerce's rejection of the LSI statements is unlawful and contrary to prior practice. *See* Oman Fast. 56.2 Br. 33; Oman

Fast. Cmts. 27. However, as Commerce correctly notes, the court has already sustained Commerce's determination that the LSI's financial statements are unreliable. *See Remand Redetermination* 17 (citing *Mid Continent I*, 41 CIT at __, 203 F. Supp. 3d at 1311). This same reasoning, by Commerce and the court, applies here with regard to the use of the LSI financial statements and, by extension, the profit rate from *Steel Nails from China*, for the calculation of a profit cap.

Nor is it unlawful for Commerce to reject data from Al Jazeera and Larsen & Toubro. As Commerce explained in the context of CV profit, Al Jazeera and Larsen & Toubro's respective profit rates are unlikely to approximate the profit normally realized by producers in Oman Fasteners' line of business. *See Remand Redetermination* 12. The profit rates of Al Jazeera and Larsen & Toubro may be subject to certain market conditions shared by all companies doing business in Oman, and therefore may fluctuate in tandem with that of Oman Fasteners. But it does not necessarily follow that these three companies will realize similar profit rates in an absolute sense. In light of Commerce's thorough explanation of Al Jazeera and Larsen & Toubro's respective production experiences, as compared to that of Oman Fasteners, Commerce reasonably concluded that neither of these companies is a suitable source for a profit cap.

Finally, the court has already sustained Commerce's determination that Oman Fasteners' own home market sales are too small to be deemed reliable for the purposes of CV profit. *See Mid Continent I*, 41 CIT at __, 203 F. Supp. 3d at 1307. The court agrees with Commerce that the determinations underlying CV profit and the profit cap "largely track the same analysis." *Remand Redetermination* 35. On this basis, we sustain Commerce's decision not to use Oman Fastener's own sales to calculate a profit cap.

Oman Fasteners insists that a profit cap is required to ensure that CV profit is representative of Oman Fasteners' sales experience. Oman Fast. Cmts. 27. However, while the record allows this inference, it does not require it. Oman Fasteners focuses on the disparity between the CV profit rate sourced from the Hitech data and a handful of other profit rates on the record. *Id.* at 30. But each of Oman Fastener's comparators—LSI, Al Jazeera and Larsen & Toubro, its own sales—has been reasonably discarded as unrepresentative or unreliable in this proceeding. Consequently, the court can draw no inferences from the mere difference in profit rates.

In sum, under certain circumstances, Commerce can decline to calculate a profit cap. *See Husteel Co.*, 39 CIT at __, 98 F. Supp. 3d at 1348. Here, Commerce reasonably explained, with the support of substantial evidence, that "none of the other possible profit cap sources fulfill the statute any better than no cap." *Remand Redetermination* 14 (citation and internal quotation marks omitted). The court therefore sustains Commerce's decision to calculate no profit cap.

## CONCLUSION

For the foregoing reasons, the court sustains Commerce's final results of redetermination pursuant to court order. Judgment will be entered accordingly.

/s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated: November 20, 2017
New York, New York