UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

|  |  |
|---|---|
| MID CONTINENT STEEL & WIRE INC., <br><br>  Plaintiff, <br><br> v. <br><br> THE UNITED STATES, <br><br>  Defendant, <br><br> and <br><br> OMAN FASTENERS, LLC, <br><br>  Plaintiff and Defendant-Intervenor. | Consol. Court No. 15-00214 |

**COMMENTS OF PLAINTIFF OMAN FASTENERS, LLC IN OPPOSITION
TO THE COMMERCE DEPARTMENT'S REMAND REDETERMINATION**

 

Michael P. House
Andrew Cardias
Shuaiqi Yuan

Perkins Coie LLP
700 Thirteenth St., NW
Washington, D.C. 20005
202-654-6200

*Counsel to Plaintiff Oman Fasteners, LLC*

Dated: May 12, 2022

**TABLE OF CONTENTS**

Page

INTRODUCTION AND SUMMARY OF THE ARGUMENT ................................................... 1

SUMMARY OF THE CASE .............................................................................................................. 3

ARGUMENT ........................................................................................................................................ 5

    I.    The Two Financial Statements Commerce Considered Indisputably Reflect Subsidies that Previously Led Commerce to Reject Them ....................... 5

    II.    Commerce Ignored the Courts' Instruction to Consider all Financial Statements in the Record ................................................................................................ 6

    III.    Other Financial Statements in the Record are Superior Sources of CV Profit ......................................................................................................................... 10

    IV.    Alternatively, Commerce Must Reopen the Record to Obtain the "Readily Available, Highly Relevant Information" Required by the Federal Circuit ........ 11

CONCLUSION ................................................................................................................................. 14

**CASES**

*CP Kelco US, Inc. v. United States*,
   211 F.Supp.3d 1338, 1340 (Ct. Int'l Trade Feb 17, 2017) .................................................. 8, 9

*CP Kelco US Inc. v. United States*,
   949 F.3d 1348 (Fed. Cir. 2020) .................................................................................................. 8

*CP Kelco US Inc. vs. United States*,
   Slip Op. 15-27, 2015 WL 1544714 (Ct. Int'l Trade Mar. 31, 2015) .................................... 7, 8

*Mid Continent Steel & Wire, Inc. v. United States*,
   551 F.Supp.3d 1360 (Ct. Int'l Trade 2021) ................................................................... passim

*Mid Continent Steel & Wire, Inc. v. United States*,
   941 F.3d 530 (Fed. Cir. 2019) ......................................................................................... passim

**OTHER AUTHORITIES**

19 C.F.R. § 351.301 .................................................................................................................... 13

*Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from India*,
   85 Fed. Reg. 12,897 (March 5, 2020) ........................................................................................ 5

*Certain Steel Nails from China*,
   79 Fed. Reg. 19,316 (April 8, 2014) ......................................................................................... 10

*Certain Steel Nails from China*,
   79 Fed. Reg. 58,744 (Sept. 30, 2014) ....................................................................................... 12

*Certain Steel Nails from China*,
   80 Fed. Reg. 18,816 (April 8, 2015) ......................................................................................... 12

*Steel Wire Garment Hangers from the People's Republic of China*,
   79 Fed. Reg. 65,616 (Nov. 5, 2014) ....................................................................................... 5, 6

U.S. Court of International Trade Rule 56.2 ................................................................................ 1

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Pursuant to U.S. Court of International Trade Rule 56.2, Oman Fasteners, LLC ("Oman Fasteners") submits these comments on the U.S. Department of Commerce's ("Commerce") April 12, 2022 Final Results of Redetermination, ECF No. 150-1 ("Final Redetermination") pursuant to the opinion and remand order of the U.S. Court of Appeals for the Federal Circuit in *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530 (Fed. Cir. 2019) ("*Mid Continent I*"), and this Court's opinion and remand order in *Mid Continent Steel & Wire, Inc. v. United States*, 551 F.Supp.3d 1360 (Ct. Int'l Trade 2021) ("*Mid Continent II*"). These comments are timely per Rule 56.2 and the Court's order dated March 11, 2022, ECF No. 149.

Two years ago, commenting on Commerce's redetermination following *Mid Continent I*, we explained that Commerce paid mere lip service to the Federal Circuit's instruction to "reconsider" reliance on a financial statement tainted by subsidies to determine constructed value ("CV") profit for Oman Fasteners. *See Mid Continent I*, 941 F.3d at 545. That is equally true now that Commerce has simply replaced one subsidy-tainted financial statement with another.

Following this Court's decision in *Mid Continent II*, Commerce correctly concluded that its continued reliance on the financial statement of Hitech Fastener Manufacturer (Thailand) Co., Ltd. ("Hitech") was untenable. However, Commerce's solution, substituting the arguably *worse* financial statement of Sundram Fasteners Limited ("Sundram"), which reflects countervailable subsidies *and* merchandise that is not comparable to Oman Fasteners' steel nails, is no improvement.

Commerce concedes that the financial statements of Hitech and Sundram are equally tainted by subsidies, and that it has previously rejected the financial statements of both companies on that basis in prior cases. Yet the Final Redetermination sets up a false choice between these two tainted financial statements because Commerce refuses to compare all the financial

statements in the record. Instead, Commerce eliminates every other financial statement based on a single perceived flaw, without examining whether that flaw is more egregious than the undisputed flaws of the Hitech and Sundram financial statements—including the countervailable subsidies that led the Federal Circuit and this Court to reject Commerce's prior redeterminations.

Properly considered, the record contains at least two financial statements superior to Hitech and Sundram: the partially translated financial statement of L.S. Industry Co., Ltd. ("LSI"), a Thai producer of identical merchandise (the only financial statement in the record from a company that produces steel nails, the subject merchandise at issue), and the financial statement of Al Jazeera Steel Products Co. ("Al Jazeera"), an Omani producer of fabricated steel products (the only financial statement on the record reflecting the profit of a company that sells steel products in the home market of Oman). Because Commerce fails to adequately explain its preference for Sundram over these two surrogates, the Final Redetermination is not supported by substantial evidence.

Alternatively, absent a fully reliable financial statement on the record, Commerce's refusal to reopen the record to allow Oman Fasteners to submit the fully translated financial statement of LSI is an abuse of discretion.

## SUMMARY OF THE CASE

The issues remaining before the Court arise out of Commerce's final determination in the antidumping duty investigation of *Steel Nails from Oman*, Case No. A-523-808, in which Commerce relied on Hitech's financial statement. Oman Fasteners challenged Commerce's CV profit calculation, ultimately resulting in the Federal Circuit's decision in *Mid Continent I*, which ordered Commerce to reconsider its disregard for subsidies in assessing Hitech's financial statements as a source of surrogate CV profit. *Mid Continent I*, 941 F.3d at 545. The Federal Circuit stated:

> Commerce undisputedly refused to consider whether Hitech was receiving subsidies.
>
> . . . .
>
> Commerce's reasoning is insufficient. . . . {A}lthough the statute explicitly provides for the removal of subsidies in nonmarket-economy proceedings, it does not follow from that focused authorization in one context that Commerce is free to ignore subsidies in market-economy proceedings when doing so would be an unreasonable exercise of its authority in those proceedings. . . . Commerce has not provided any explanation at all of why, either generally or in this case, it is reasonable to decline to consider government subsidies to the company whose profits Commerce is borrowing for use in calculating a constructed value.

*Id.* at 544.

This Court remanded Commerce's determination for reconsideration in accordance with *Mid Continent I*. ECF No. 130. In its final redetermination following that remand, Commerce again relied on Hitech's financial statements. This Court remanded again, concluding that Commerce's continued reliance on Hitech's financials statement without considering the effect of government subsidies when calculating CV profit rate was not supported by substantial evidence and reasoned explanation. *Mid Continent II*, 551 F.Supp.3d at 1368. The Court explained:

> To the extent that Commerce wishes to rely on Hitech's financial

3

> statements, the agency must seriously engage with the possible inclusion of subsidies in those statements. Specifically, Commerce must address why the above quoted language in the financial statements is sufficient to be considered "evidence of a subsidy" in {a prior case} yet may be ignored in this case. . . . If Commerce reconsiders its comparative analysis between Hitech's and Sundram's financial statements, it must address whether and, if so, why, the financial statements with a potential subsidy is preferable to one with a limited percentage of comparable merchandise production, given that both would seem to be impacted by factors not related to the production and sale of comparable merchandise. Commerce must also address whether a comparative analysis inclusive of the other financial statements on the record is appropriate.

*Id.*

Commerce has now issued the Final Redetermination. Therein, Commerce admits that both Hitech's and Sundram's financial statements were tainted by subsidies, and, for the first time, selects Sundram's financial statement as the basis for calculating CV profit rate. Despite both of its potential choices being tainted by subsidies, and despite its new choice of Sundram also having only "a limited percentage of comparable merchandise production," Commerce once again refused to engage in a "comparative analysis inclusive of the other financial statements on the record." *Mid Continent II*, 551 F.Supp.3d at 1368.

# ARGUMENT

**I.    THE TWO FINANCIAL STATEMENTS COMMERCE CONSIDERED INDISPUTABLY REFLECT SUBSIDIES THAT PREVIOUSLY LED COMMERCE TO REJECT THEM**

It is undisputed that the only two financial statements that Commerce compared on remand—those of Hitech and Sundram—were tainted by subsidies. Regarding Hitech, Commerce explains:

> . . . Hitech's FS states: "The company has been support {sic} for production screws (SCREW) Category 4.7 Manufacture of wire products, metal wire, Promotional Number 1447/2538 on July 10, 1995." We infer this statement means that Hitech . . . {received} support in the production of screws. In *Steel Wire Garment Hangers from China*, a contemporaneous administrative review to the Final Determination, we found the statement in . . . Hitech's FS sufficiently demonstrated receipt of a subsidy and declined to consider Hitech's FS in our calculation of surrogate values to value factors of production. . . . Therefore, consistent with the evidentiary finding in that case, we find here that Hitech's FS contain evidence of subsidies.

Final Redetermination at 5-6 (citing *Steel Wire Garment Hangers from the People's Republic of China*, 79 Fed. Reg. 65,616 (Nov. 5, 2014) (prelim results), and accompanying Preliminary Decision Memorandum ("PDM") at 26). With regard to Sundram, Commerce continued:

> Sundram, also received subsidies during the fiscal period . . . . Sundram's cash flow statement in its FS recognizes receipt of 30 Lakhs during the 2013-14 period, which according to note 31, accounting standard (AS) 12, Sundram received from the "state government of Uttarakhand as special capital subsidy, for setting up an industrial undertaking in the state." We have previously found this program to be countervailable.

*Id*. at 6-7 (citing *Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from India*, 85 Fed. Reg. 12,897 (March 5, 2020) (prelim results), and accompanying PDM at 29). "Therefore, {Commerce} f{ou}nd that both Hitech and Sundram received subsidies during the fiscal period." *Id.* at 7.

By its own admission, "it is not {Commerce's} preference to use data which include subsidies," and Commerce "consider{s} Hitech and Sundram equal in that they both indicate that they received some form of a subsidy." *Id.* Yet despite admonishment in *Mid Continent I* and *II*, Commerce continues to rely on subsidy-tainted financials.

### II.   COMMERCE IGNORED THE COURTS' INSTRUCTION TO CONSIDER ALL FINANCIAL STATEMENTS IN THE RECORD

The Final Redetermination's false choice between two admittedly flawed financial statements, Hitech and Sundram, is unsupported by substantial evidence and contrary to law. Commerce states that Sundram is "{t}he only other company on the record of the investigation which Commerce has not declined to use that produces comparable merchandise." Final Redetermination at 6. But that statement begs the question.

By Commerce's own admission, the presence of countervailable subsidies would normally render a financial statement unusable. Here, the countervailable subsidies received by Hitech and Sundram plainly distort those companies' costs of production and stated profits. In *Mid Continent I* the Federal Circuit specifically recognized the danger of relying on financial statements of companies that are subsidized:

> A company that receives government subsidies to produce certain merchandise may have "expenses separately recouped by income other than receipts from selling that merchandise." Subsidies may increase recorded profit, for example, if they are included on the receipt side of a profit calculation or if they take the form of artificially lower input costs. Thus, *government subsidies are precisely the kind of factor that could distort the accuracy of a surrogate company's information.*

941 F.3d at 544 (emphasis added).

Commerce does not articulate a sufficient basis for preferring the countervailable subsidies evident in the Hitech and Sundram financial statements over the flaws identified by Commerce with respect to other financial statements included in the record, such as the partially-

6

translated financial statement of LSI, a Thai producer of identical merchandise (the only financial statement from a producer of steel nails), or the financial statement of Al Jazeera, an Omani producer of fabricated steel products (the only financial statement reflecting sale of steel products in the home market of Oman). Even if Commerce would generally prefer not to use financial statements that are not fully translated or financial statements of companies that do not produce comparable merchandise, that is no different than Commerce's stated preference against subsidy-distorted financial statements.

This is precisely why both the Federal Circuit in *Mid Continent I* and this Court in *Mid Continent II* instructed Commerce to engage in a comparative analysis of deficiencies in all the financial statements in the record. As the Federal Circuit noted, the distortive effect of a subsidy on a company's profits may be sufficiently large "that Commerce would no longer have a sound reason to choose Hitech {(or Sundram)} over another proposed source of profit information, whether from OF's home country or elsewhere. The size of any subsidies would obviously be relevant, *as would the comparative deficiencies of the alternative sources*." *Id.* (emphasis added).

This Court noted that "the Federal Circuit acknowledged that Commerce may need to engage in a comparative analysis of the deficiencies of multiple financial statements." *Mid Continent II*, 551 F.Supp.3d at 1367. Indeed, the Court has consistently ruled that, "{w}hen presented with multiple imperfect potential surrogate-data sources, Commerce must faithfully compare the strengths and weaknesses of each before deciding which to use." *CP Kelco US Inc. vs. United States*, Slip Op. 15-27, 2015 WL 1544714 (Ct. Int'l Trade Mar. 31, 2015) at 13 ("*CP Kelco I*"). *CP Kelco I* instructed Commerce to "compare and contrast" the partially translated third-country statements with other potential third-country statements that were tainted by countervailable subsidies "and to explain why the {tainted but fully translated} statements constitute a better

7

source." *Id*. at 15. Subsequently, the Court rejected Commerce's self-described practice of "rejecting from use financial statements that are incomplete . . . unless there are no other financial statements left on the record," because Commerce's approach did not constitute a faithful comparison of the strengths and weaknesses of each source of potential surrogate financial data. *CP Kelco US, Inc. v. United States*, 211 F.Supp.3d 1338, 1340 (Ct. Int'l Trade Feb 17, 2017) ("*CP Kelco II*").[1]

The Final Redetermination fails to heed *Mid Continent I* and *II*'s instructions because it compares only two subsidy-distorted financial statements, without articulating why the deficiencies of these financial statements are less egregious than those of the nine other financial statements that Commerce rejected out of hand. While Commerce protests that it "acknowledged and considered all eleven FS on the record of the investigation," Commerce's analysis belies that claim. *See* Final Redetermination at 13-14. It shows that Commerce never considered, much less sufficiently explained, how the flaws it identified in other financial statements in the record compared to the distortive effect of Hitech and Sundram's subsidies.

First, Commerce rejected all six Omani financial statements on the record, finding that "all six Omani {financial statements} represent companies involved in production of dissimilar merchandise outside of the steel nails general category of merchandise." *Id*. at 13. Commerce reasoned that "these six {financial statements} are less ideal sources for CV profit and ISE information vis-à-vis companies which produce and sell subject merchandise." *Id.* That may be when the record contains flawless financial statements of companies which produce subject merchandise, but that is not the case here. Commerce never explains why the difference between

---

[1] While on appeal the Federal Circuit ultimately supported Commerce's decision not to use to the partially translated financial statement, it did so on other grounds, stating: "To be clear, we do not decide today whether Commerce must accept or refuse a partial translation of financial statements in every case, or that it is required to do so." *CP Kelco US Inc. v. United States*, 949 F.3d 1348, 1359 (Fed. Cir. 2020).

merchandise produced by each Omani company and Oman Fasteners is more significant than the distortive subsidies collected by Hitech and Sundram. Commerce's claim that the Federal Circuit has sanctioned its choice, *see id.* at 14, is incorrect: while the Federal Circuit agreed that Commerce could prefer third country producers that better matched Oman Fasteners' merchandise, it explicitly rejected Commerce's reliance on *subsidy*-tainted third country financial statements. *Mid Continent I*, 941 F.3d at 538-40, 543-45.

Second, Commerce rejected three financial statements in the record because "the LSI and two Taiwanese FS are incomplete, *i.e.*, missing an auditor's report and the majority of their data disclosures under their countries' respective generally accepted accounting principles (GAAP)." Final Redetermination at 14. Commerce "f{ou}nd that the LSI and both Taiwanese FS are less preferable than Sundram's FS because Sundram's FS include{s} all of the information necessary to calculate accurate and reliable financial ratios." *Id.* at 15. That is a faulty premise: given Sundram's distortive subsidies, its financial statement only permits Commerce to calculate *in*accurate and *un*reliable financial ratios. Commerce makes no effort to explain why the *possibility* that untranslated portions of the three financial statements it rejected might contain information calling their accuracy and reliability into question outweighs the *certainty* that Hitech and Sundram's financial statements are inaccurate and unreliable due to distortive subsidies. Again, Commerce's claim that the Federal Circuit has sanctioned its choice, *see id.* at 15, is incorrect: while the Federal Circuit agreed that Commerce could find a partially translated financial statement unreliable, it never concluded that such a statement was *less* reliable than one tainted by subsidies. *Mid Continent I*, 941 F.3d at 540-42, 543-45.

9

### III. OTHER FINANCIAL STATEMENTS IN THE RECORD ARE SUPERIOR SOURCES OF CV PROFIT

Appling the fulsome comparison of financial statements in the record ordered by this Court and the Federal Circuit shows that there are financial statements in the record—specifically those of LSI and Al Jazeera—which are superior to the financial statements of Hitech and Sundram as sources of CV profit data.

LSI is the only surrogate on the record that produces identical merchandise to Oman Fasteners, steel nails, the subject merchandise at issue in this case. Commerce specifically selected the identical partially translated LSI financial statement in the fourth review of *China Nails*, finding it preferable to the financial statement of Hitech, which, in addition to being distorted by subsidies, reflected the production and sale of merely comparable merchandise. *Certain Steel Nails from China*, 79 Fed. Reg. 19,316 (April 8, 2014) (final results), Issues and Decisions Memorandum ("IDM") at Comment 2.

Commerce's prior preference for LSI's partially translated financial statement over the subsidy-distorted financial statement of Hitech applies with even greater force to the financial statement of Sundram, which, in addition to being distorted by subsidies, reflects production and sale of a much smaller proportion of comparable merchandise. Commerce found that only 36 percent of Sundram's production is attributable to merchandise comparable to Oman Fasteners. Final Redetermination at 8-9. This Court previously noted that Sundram's "limited percentage of comparable merchandise production" was a serious limitation on its usefulness as a surrogate for Oman Fasteners, given that its financial statement "would seem to be impacted by factors not related to the production and sale of comparable merchandise." *Mid Continent II*, 551 F.Supp.3d at 1368.

Yet Commerce refused to follow its *China Nails* precedent and find that the partially translated statement of LSI, a producer of identical merchandise, is superior to the subsidy-distorted financial statements of a company producing only a small percentage of merely comparable merchandise. Commerce "does not explain or identify any difference between the two cases that would lead to such different treatment." *Mid Continent II*, 551 F.Supp.3d at 1366.

The financial statement of Al Jazeera reflects the profit of a company that produces and sells fabricated steel products in the home market of Oman. Al Jazeera's home market experience and lack of distorting subsidies make it a superior surrogate for Oman Fasteners compared to either Hitech or Sundram. The fact that Al Jazeera does not produce steel fasteners, and instead produces other fabricated steel products, is less relevant than the *combined* facts that Hitech and Sundram are located in third countries *and* receive subsidies. This is especially true when comparing Al Jazeera and Sundram, given that nearly two-thirds of Sundram's production consists of merchandise dissimilar to Oman Fasteners. Al Jazeera is also a particularly apt source of CV profit data since its financial statement was submitted by the petitioner as part of the Petition, and thus served as the basis for the Department's initiation of this investigation. P.R. 10-12, Exhibit Oman AD-18. Commerce does not adequately explain why the fact that *one third* of Sundram's production consists of comparable merchandise outweighs the fact that Al Jazeera operated within Oman Fasteners' home market and did not receive countervailable subsidies.

IV. **ALTERNATIVELY, COMMERCE MUST REOPEN THE RECORD TO OBTAIN THE "READILY AVAILABLE, HIGHLY RELEVANT INFORMATION" REQUIRED BY THE FEDERAL CIRCUIT**

There is an alternative solution open to Commerce that would produce the most accurate result: Commerce could reopen the record, allowing both Oman Fasteners and the petitioner to substitute fully translated financial statements for the partially translated ones Commerce continues to reject. Oman Fasteners has fought for that opportunity since the original underlying

11

investigation after Commerce, without prior warning, decided to reverse course and refuse the partially translated LSI financial statement. At that time, Commerce had relied on the same partially translated LSI financial statement in the third, fourth and fifth administrative reviews in the concurrent *Steel Nails from China* proceeding and had specifically determined that LSI's partially translated financial statement was more reliable than the fully translated financial statement of Hitech in determining a nail producer's CV profit rate. Commerce also relied on LSI's financial statement after receiving a full translation, belying Commerce claim that the untranslated portions of the LSI statement might in some way discredit the translated portions. *See Certain Steel Nails from China*, 80 Fed. Reg. 18,816 (April 8, 2015) (final results), IDM at 13.

Commerce's reply to Oman Fasteners' request to reopen the record on remand is that "interested parties already had the opportunity to submit readily available, highly relevant information during the investigation," and that "the record contains sufficient {financial statements} in order to render an accurate determination." *See* Final Redetermination at 16-17. As a threshold matter, Commerce's claim of "opportunity" rings hollow when Commerce refused to allow Oman Fasteners to supplement the record with fully translated versions of LSI's financial statements more than *three months* before the deadline for Commerce's final determination in the underlying investigation, Commerce Letter to Oman Fasteners (Feb. 13, 2015), and earlier than the comparable point in the *Steel Nails from China* fifth administrative review when Commerce *sua sponte* requested that the interested party submit the same fully translated LSI statement nearly four months after the preliminary results. *See* P.R. 191 at 36, n.75; *Certain Steel Nails from China*, 79 Fed. Reg. 58,744 (Sept. 30, 2014) (prelim. results).

As Commerce recognizes, *see* Final Redetermination at 16-17, its regulations clearly permit it to supplement the record after the deadline for the submission of new factual information,

*see* 19 C.F.R. § 351.301(c)(4). Given Commerce's own acknowledgement regarding Sundram's flaws, Commerce's refusal to reopen the record rises to an abuse of discretion.

The Federal Circuit clearly signaled that the current state of the record should not be a barrier to Commerce's reconsideration of its reliance on subsidy-distorted financial statements:

> Practical considerations might play a role in the reasonableness of Commerce's choice. It might be reasonable to avoid methods that demand information that cannot practically be obtained in reliable form. *On the other hand, it can be unreasonable for an agency to refuse to obtain readily available, highly relevant information*. . . .
>
> We note that the Supreme Court has made clear that an agency's failure to adduce empirical data that can readily be obtained can sometimes require setting aside an agency's decision under the Administrative Procedure Act.

*Mid Continent I*, 941 F.3d at 544-45 (emphasis added, cleaned up). As this Court added, "while the agency is not required to reopen the record, such a decision is within the agency's discretion if it determines that reopening would provide the most reasonable path forward." *Mid Continent II*, 551 F.Supp.3d at 1368.

Commerce's duty to "obtain readily available, highly relevant information" and "calculate dumping margins as accurately as possible," *Mid Continent I*, 941 F.3d at 542, make this an obvious case for Commerce to exercise its discretion and reopen the record. Commerce knows— and has known since Oman Fasteners first sought to reopen the record seven years ago—that LSI's fully translated financial statement would be the most reliable source of CV profit. Its refusal to reopen the record to permit the admission of readily available and highly relevant information flouts the Federal Circuit's remand instructions and amounts to an abuse of discretion.

## CONCLUSION

For the reasons above, Oman Fasteners respectfully requests that this Court find Commerce's Final Redetermination unlawful and unsupported by substantial evidence. The Court should remand to Commerce with instructions to disregard both Hitech and Sundram's subsidy-distorted financial statements, conduct a complete and faithful evaluation of the "comparative deficiencies" of each of the source of CV profit in the record, reopen the record to obtain any and all readily available and highly relevant information regarding CV profit, and revise its CV profit calculation accordingly.

Dated: May 12, 2022

/s/ Michael P. House
Michael P. House
Andrew Caridas
Shuaiqi Yuan
**PERKINS COIE LLP**
700 Thirteenth St., NW
Washington, D.C. 20005
202-654-6200
mhouse@perkinscoie.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of May, 2022, I electronically filed a copy of the foregoing using the CM/ECF system, which sent a notification of such filing to all counsel of record.

/s/ Michael P. House
Michael P. House

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the word count limitations in the Court's Order of March 11, 2022, ECF No. 149, in that the brief contains 3,864 words, including headings, footnotes and quotations, as tallied by the word-processing software used in its preparation.

/s/ Michael P. House
Michael P. House